James J. MONAHAN, as next friend of Daniel J. Monahan, and George Rose, as next friend of Marla Rose, Plaintiffs,

v.

STATE OF NEBRASKA; Charles Thone, Governor of the State of Nebraska; Board of Education, School District # 1, Douglas County, Nebraska; Owen Knutzen, Individually, and as Superintendent of the School District # 1, Douglas County, Nebraska; Dale Samuelson, Individually, and as Assistant Superintendent in Charge of Special Education of School District # 1, Douglas County, Nebraska; Anne Campbell, Commissioner of Education for the State of Nebraska; State Board of Education, Walter M. Thompson, Individually, and as a Member of the State Board of Education; Margaret Lockwood, Individually, and as a Member of the State Board of Education; Frank E. Landis, Individually, and as a Member of the State Board of Education; Don M. Lienemann, Individually, and as a Member of the State Board of Education; Dorothy Creigh, Individually, and as a Member of the State Board of Education; Arlene E. Hart, Individually, and as a Member of the State Board of Education; William C. Ramsey, Individually, and as a Member of the State Board of Education; Dorothy Beaver, Individually, and as a Member of the Board of Education, School District # 1, Douglas County, Nebraska; June Bostwick, Individually, and as a Member of the Board of Education, School District # 1, Douglas County, Nebraska; Walter Calinger, Individually, and as a Member of the Board of Education, School District # 1, Douglas County, Nebraska; Pat Geringer, Individually, and as a Member of the Board of Education, School District # 1, Douglas County, Nebraska; Leo Hoffman, Individually, and as a Member of the Board of Education, School District # 1, Douglas County, Nebraska; Gaynelle Goodrich, Individually, and as a Member of the Board of Education,

School District # 1, Douglas County, Nebraska; Ruth Thomas, Individually, and as a Member of the Board of Education, School District # 1, Douglas County, Nebraska; Frank Bogard, Individually, and as a Member of the Board of Education, School District # 1, Douglas County, Nebraska; Ron McGruder, Individually, and as a Member of the Board of Education, School District # 1, Douglas County, Nebraska; James A. Monaghan, Individually, and as a Member of the Board of Education, School District # 1, Douglas County, Nebraska; James Beutel, Individually, and as a Member of the Board of Education, School District # 1, Douglas County, Nebraska; and Leo Kastrick, Individually, and as a Member of the Board of Education, School District # 1, Douglas County, Nebraska, Defendants.

Civ. No. 80–0–164.

United States District Court,
D. Nebraska.

May 16, 1980.

Mino St. Lucas, Omaha, Neb., for plaintiff, Monahan.

Quintin S. Hughes, Bellevue, Neb., for plaintiff, Rose.

Harold Mosher, Asst. Atty. Gen., State of Nebraska, Lincoln, Neb., John P. Heil, Omaha, Neb., for defendants.

## MEMORANDUM

DENNEY, District Judge.

Under the Education of All Handicapped Children Act of 1975, states which accept federal assistance for the education of the handicapped are required to provide the parents of handicapped children with certain procedural safeguards. Included among these safeguards is the requirement that a person aggrieved by the educational placement of a handicapped child "shall have an opportunity for an impartial due process hearing" to determine the propriety of the school district's placement of the child. 20 U.S.C. § 1415(b)(2).

The primary issue raised by the plaintiffs' complaint is whether Nebraska statutory law conforms with the procedural requirements of the federal act. This issue focuses on L.B. 871, which was enacted by the Nebraska Unicameral in an effort to comply with the procedures outlined in the Act. *See* L.B. 871, §§ 4–11, 1978 Neb.Laws 887–89 (codified in Neb.Rev.Stat. §§ 43–661 *et seq.*). The plaintiffs contend that L.B. 871 is not consistent with federal law because the Nebraska statute fails to provide parents with an impartial due process hearing. Specifically, the plaintiffs allege that the power of the State Commissioner of Education under L.B. 871 to review the decision

made in a due process hearing prevents such hearings from being impartial under federal law.

The matter presently before the Court is the plaintiffs' request for a preliminary injunction.

■ Much of the preliminary relief sought by the plaintiffs is apparently designed to protect those persons whom the plaintiffs wish to represent through a class action suit. To date, the plaintiffs have not requested that this Court certify this lawsuit as a class action. Without class action certification, the Court cannot grant the plaintiffs' request for an injunction to protect persons not presently before the Court. Thus, the Court shall deny plaintiffs' request for a preliminary injunction to the extent that the request seeks protection for persons not named in this lawsuit.

With respect to the named plaintiffs, the Court shall consider the merits of the plaintiffs' request for a preliminary injunction. The following discussion constitutes this Court's findings of fact and conclusions of law on this issue. However, any legal or factual determination reached herein is made solely for the purpose of resolving the issue of whether the plaintiffs are entitled to preliminary relief. Such determinations do not constitute a final decision on the merits of plaintiffs' complaint.

## I.

The law governing the educational rights of handicapped children is a hybrid, whose elements are found in both federal and state statutory law. A brief review of these statutes will aid in understanding the factual setting of this case.

The principal federal statute involved in the instant case is the Education of All Handicapped Children Act of 1975 [the Act]. 20 U.S.C. § 1401 et seq. The Act is essentially a funding statute through which the federal government provides financial assistance to the states for the education of handicapped children. A state, however, is not entitled to receive these funds unless it fulfills certain prerequisites.

Among the prerequisites to funding is the requirement that the state provide procedural safeguards to protect the educational rights of handicapped children. The Act does not specifically mandate the procedural format which must be adopted by a state in order to qualify for funding. The Act, however, does require that the state procedure provide certain minimum safeguards. Within the limits of these minimum standards, the state may adopt a procedural structure suited to its needs and particular institutional setting.

For the purposes of this opinion, the minimum safeguards required by the Act may be summarized as follows. The parents of a handicapped child must be given prior written notice of any proposed change in the educational placement of their child. 20 U.S.C. § 1415(b)(1)(C). If at any time the parents become dissatisfied with any matter relating to the educational placement of their child, they must be given an opportunity to present such complaints. 20 U.S.C. § 1415(b)(1)(E). Once a complaint is filed, the state procedure must provide the parents with an opportunity for an impartial due process hearing. These due process hearings may be held at either the state or local level, whichever is specified in the state law. 20 U.S.C. § 1415(b)(2). The Act, however, does specifically require that "[n]o hearing conducted pursuant to the requirements of this paragraph shall be conducted by an employee of such agency or unit involved in the education or care of the child." 20 U.S.C. § 1415(b)(2). Any decision made in an impartial hearing held at the state level is final except for judicial review of such decision in a court of competent jurisdiction. 20 U.S.C. § 1415(e)(1).

In response to this federal legislation, the Nebraska Unicameral enacted L.B. 871, which created a procedural framework designed to make Nebraska eligible for funding under the Act. Nebraska Legislative Floor Debate on L.B. 871, 85th Legis. 2d Sess. 08706, 09246 (1978) (statements of Senator Koch). The procedure adopted by the Unicameral permits the parent of a handicapped child to initiate a hearing on

matters related to the child's placement. Neb.Rev.Stat. § 43–661 (Reissue 1978). These hearings are conducted at the state level by the Nebraska Department of Education, using hearing officers. Under the Nebraska statute, the hearing officer is required to make a hearing report containing a decision based on the officer's factual findings. Neb.Rev.Stat. § 43–662. Upon receipt of the hearing officer's report, the state statute directs that the Commissioner of Education, after reviewing the report, "shall then recommend or direct such action as may be necessary." Neb.Rev.Stat. § 43–662.

The preceding discussion summarizes the state and federal law involved in this litigation. The next matter which must be considered is the specific factual setting of each plaintiff's claim.

## II.

*Plaintiff Rose*

Plaintiff, George Rose, is the father of Marla Rose, a multi-handicapped child. Prior to the 1978–79 school year, Marla attended classes at Beveridge Junior High School. This school is part of the Omaha School District, a defendant in this action. While attending Beveridge, Marla's school day was divided between special education classes and regular classes. Thus, at Beveridge, she was able to interact with non-handicapped children of her own age group during the course of a normal school day.

In June of 1978, the Roses received written notice from the Omaha School District of a proposed change in Marla's educational placement. The district's proposed change would have placed Marla in the Nebraska School for the Deaf on a residential basis. This change was motivated by the district's assessment that the Beveridge placement no longer provided Marla with an appropriate education. At Beveridge, Marla had been educated by the oral method of instruction. However, the district concluded that Marla was not making any progress under the oral method. The district, therefore, decided that Marla should be assigned an educational placement in which she would receive instruction under both the oral method and the manual method of instruction. The only facility equipped to teach both these methods to a person of Marla's age was the Nebraska School for the Deaf.

After receiving notice of this proposed change of placement, Marla's parents informed the local school authorities of their objections to this change. The Omaha School District, however, refused to withdraw the proposal. Confronted with this refusal, the Roses made a written request for an impartial due process hearing. This hearing was to be conducted by the State Department of Education, pursuant to Neb. Rev.Stat. § 43–661 *et seq.*

The Roses' request for a hearing was made on August 14, 1978. Following several continuances, the hearing was completed on March 23, 1979. A transcript of the hearing was prepared and the parties were given an opportunity to submit final written arguments. Upon receipt of the final arguments, the hearing officer prepared his report, which was delivered to the Commissioner of Education on May 16, 1979. In this report, the hearing officer recommended that the Roses' appeal be dismissed because the school district's proposed placement in the Nebraska School for the Deaf would provide Marla with an appropriate education [Exhibit # 5]. Finally, on June 1, 1979, the Commissioner of Education, a defendant in this action, signed the final decision and order in the Rose case. The Commissioner's decision adopted verbatim the report of the hearing officer, and dismissed Rose's appeal based on that report [Exhibit # 1].

Despite the Commissioner's decision, Marla's parents still refused to accept the school district's proposed placement in the Nebraska School for the Deaf. Thus, on June 28, 1979, George Rose filed a *pro se* complaint in this Court seeking a judicial review of the Commissioner's decision [CV 79–0–300]. The parties to that case entered into a stipulation in which they agreed that Marla should attend Monroe Junior High School

during the pendency of CV 79–0–300. In essence, the stipulation was designed to insure that Marla would receive the same type of education she had received at Beveridge, except that the program would be located at Monroe [Exhibit # 6]. It is clear from testimony of the parties and stipulation itself that neither the school district nor George Rose believed that this temporary placement would provide Marla with an appropriate education. The purpose of the stipulation was merely to maintain the status quo during the litigation, as required by 20 U.S.C. § 1415(e)(3).

Notwithstanding the stipulation of the parties, Marla's temporary placement at Monroe was terminated two weeks after its implementation. This termination was precipitated by the Roses' belief that the school district had unilaterally increased the special education component of Marla's placement. Following Marla's removal from Monroe, she was enrolled in the Baptist School, where she has remained ever since.

The Baptist School is not staffed by accredited teachers, nor has it received state accreditation. More importantly, it appears that Marla is not receiving any special education at the Baptist School. The parties, thus, agree that the Baptist School is not an appropriate educational placement for a person with Marla's handicap.

With respect to CV 79–0–300, it should be noted that that case was dismissed on November 29, 1979. Subsequently, on February 2, 1980, Mr. Rose filed a second lawsuit [CV 80–0–67], again seeking judicial review of the Commissioner's decision. This second suit is still pending before this Court. The instant action was filed on March 6, 1980, and is based on essentially the same allegations made in the prior suits.

*Plaintiff Monahan*

Plaintiff, James H. Monahan, is the father of Daniel J. Monahan, a multi-handicapped child. From 1972 until the spring of 1979, Daniel attended the Madonna School, a private elementary school for the mentally retarded. Initially, the cost of Daniel's education at Madonna was paid by his parents. However, his tuition during his last three years at Madonna was paid by the Omaha School District under a contract with the school.

In the spring of 1979, Daniel became confined to a wheelchair. This change in his physical condition necessitated a change in his educational placement, since the Madonna School was not equipped to educate mentally retarded students who were wheelchair bound. Thus, Daniel was forced to leave the Madonna School in June of 1979.

Responding to these developments, Daniel's father contacted the Millard School District and requested that the district recommend a new educational placement for Daniel. The Millard District performed a new evaluation of Daniel, and recommended that he be placed in the development center at George Norris Elementary School, a part of the Millard School District.

Armed with the Millard School District's recommendation, Monahan then sought the Omaha School District's approval of the George Norris placement. This request for approval was initially made to Dr. Samuelson, Assistant Superintendent of Special Education for the Omaha School District and a defendant in this action. Dr. Samuelson, however, refused to give Monahan the unqualified approval he desired. Through Samuelson, the Omaha School District apparently agreed to permit Daniel to attend George Norris, but refused to pay the costs of such placement. This refusal to finance the George Norris placement was based on Dr. Samuelson's determination that the Omaha District's own Hartman Elementary School could provide Daniel with the same education as George Norris. Given the availability of the Hartman placement, the Omaha School District refused to finance Daniel's education in a school located in another district.

Monahan was not satisfied with Dr. Samuelson's decision. Thus, in August of 1979, he took his request for funding to Dr. Owen Knutzen, Superintendent of the Omaha School District and a defendant in this action. Dr. Knutzen, however, refused to alter the prior determination of Dr. Samuelson.

Despite the school district's refusal to finance the George Norris placement, Daniel did begin attending classes at the Millard school in August of 1979. The cost of Daniel's education is presently being paid by his father, and amounts to approximately Seven Thousand Dollars per year.

Following Dr. Knutzen's decision not to alter the determination of Dr. Samuelson, Monahan sought funding directly from the Omaha School District's Board of Education, a defendant in this action. However, in January of 1980, the Board refused to review Dr. Knutzen's decision.

Unlike plaintiff Rose, Monahan never attempted to have the school district's decision reviewed by an impartial due process hearing at the state level. This decision not to request a hearing was based on Monahan's belief that he could not receive an impartial hearing under Nebraska law. Thus, after the school board's decision in January of 1980, Monahan filed suit in this Court without seeking administrative relief pursuant to Nebraska law.

### III.

Before considering the merits of the plaintiffs' request for a preliminary injunction, the Court must consider a number of procedural issues raised by the defendants' briefs.

*Statute of Limitations*

■ The Education of All Handicapped Children Act provides:

Any party aggrieved by the findings and decision made . . . [in the due process hearing] . . . shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy. In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(e)(2).

This statute creates a federal cause of action which is not restricted by any federal statute of limitations. When a federal statute creates a cause of action without a limitation period, the Court must apply the most analogous state statute of limitations in determining whether a cause of action under the federal statute has been timely brought.

The defendants in the instant action contend that Rose's claim under 20 U.S.C. § 1415(e)(2) is barred by the statute of limitations found in Neb.Rev.Stat. § 84–917(2) (Reissue 1976). This contention is founded on the defendants' interpretation of the Nebraska law governing judicial review of educational placement decisions. Under Nebraska law, an order of the Commissioner of Education following a due process hearing is subject to judicial review. Neb.Rev.Stat. § 43–666. The scope and nature of this review is governed by Nebraska's administrative procedure law. This law requires that a person seeking judicial review of an agency order must file suit within thirty days of the agency's decision. Neb.Rev.Stat. § 84–917(2). Based on these statutes, the defendants argue that Rose's claim under 20 U.S.C. § 1415(e)(2) could have been brought in state court under Neb.Rev.Stat. § 43–666, and that therefore the most analogous state statute of limitations is the thirty day limitation period governing suits under Neb.Rev.Stat. § 43–666. Thus, the defendants conclude that Rose's claim under 20 U.S.C. § 1415(e)(2) is barred since the instant action was not filed within thirty days of the Commissioner's order dismissing Rose's appeal.

■ Federal courts have not developed a uniform analytical approach for determining the most analogous state statute of limitations. *See generally Clark v. Mann*, 562 F.2d 1104, 1111–12 (8th Cir. 1977); *Chambers v. Omaha Public School District*, 536 F.2d 222, 226–27 (8th Cir. 1977). The case law, however, suggests that the selection of an appropriate limitations period often depends on two separate factors. First, a determination is made as to wheth-

er the allegations constituting the plaintiffs' federal claim state a cause of action under state law. *See Green v. Ten Eyck,* 572 F.2d 1233, 1237–39 (8th Cir. 1978); *Warren v. Norman Realty Co.,* 513 F.2d 730, 734 (8th Cir. 1975), *cert. denied* 423 U.S. 855, 96 S.Ct. 105, 46 L.Ed.2d 81 (1975). However a determination that the plaintiff's federal claim also states a cause of action under state law does not require that the federal court automatically adopt the limitations period governing the state cause of action. Rather, the court must next consider the nature of the judicial proceedings involved in the state court. Thus, once a state cause of action similar to the plaintiffs' federal claim is found to exist, the next issue is whether the state judicial proceedings available to a plaintiff asserting the state cause of action are equivalent to the federal judicial proceedings available to a plaintiff asserting the federal claim. If the state and federal proceedings are not similar, then the limitations period applicable to the state proceedings should not be applied to the federal claim. *See Warren v. Norman Realty, supra,* 513 F.2d at 735; *Waters v. Wisconsin Steel Works of International Harvester Company,* 427 F.2d 476, 488 (7th Cir. 1970), *cert. denied,* 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970); *Metcalf v. Omaha Steel Castings Co.,* 476 F.Supp. 870, 872 (D.Neb.1979), *Smith v. Perkin-Elmer Corp.,* 373 F.Supp. 930, 936 (D.Conn.1973).

In applying these factors to the instant case, the Court will assume that the defendants are correct in asserting that Rose's claim under 20 U.S.C. § 1415 states a cause of action under Neb.Rev.Stat. § 43–666. The Court, however, still must determine whether the state and federal proceedings in issue here are sufficiently analogous to justify application of § 43–666's limitation period to Rose's federal claim. For the reasons discussed below, the Court finds that they are not analogous.

The scope of the judicial proceedings available to a plaintiff under Neb.Rev.Stat. § 43–666 is limited. See Neb.Rev.Stat. §§ 84–917 to 919. In essence, a party suing under the provision is only entitled to a limited judicial review of the administrative record. The parties to such a proceeding may not request that the court consider any evidence not contained in the administrative record. Neb.Rev.Stat. § 84–917(5). More importantly, the reviewing court does not have the authority to make an independent *factual* determination based on the administrative record, but is limited to determining whether the agency decision is based on substantial evidence or is arbitrary and capricious. Neb.Rev.Stat. § 84–917(6)(e), (f).[1] In other words, a party suing under Neb.Rev.Stat. § 43–666 is *not* entitled to a trial *de novo* of the factual issues decided by the Commissioner's order. *See 20's Inc. v. Nebraska Liquor Control Commission,* 190 Neb. 761, 763–766, 212 N.W.2d 344, 346–47 (1973).

In stark contrast to the limited review available under Neb.Rev.Stat. § 43–666 is the broad scope of the Court's authority under 20 U.S.C. § 1415(e)(2). Any party involved in a § 1415 action is entitled to present evidence not found in the administrative record. 20 U.S.C. § 1415(e)(2). Moreover, this federal statute requires that the reviewing court make an independent decision based on a preponderance of all the evidence. 20 U.S.C. § 1415(e)(2). *See Joint Explanatory Statement of the Committee of Conference,* S.Rep.No.94–455, 94 Cong., 1st Sess., at 50, reprinted in U.S.Code Cong. and Admin.News, at 1503 (1975). Thus, a suit under § 1415(e)(2) is practically indistinguishable from the normal civil action in which all the issues of the case are tried *de novo.*[2] *See generally Laura M. v. Special School District No. 1,* No. 4–79 Civ. 123, slip

---

1. The reviewing court, however, can make independent determinations of questions of law. Neb.Rev.Stat. § 84–917(6)(a) to (d).

2. The legislative history clearly shows that Congress rejected the limited type of review found in Neb.Rev.Stat. § 43–666 in favor of the broad review found in 20 U.S.C. § 1415(e)(2). *Joint Explanatory Statement of the Committee of Conference,* S.Rep.No.94–455, 94 Cong., 1st Sess., at 47–50, *reprinted in* U.S.Code Cong. and Admin.News, at pp. 1500–03 (1975).

op. at 8 (D.Minn. Jan. 21, 1980); *New York State Association of Retarded Children, Inc. v. Carey*, 466 F.Supp. 479, 486 (E.D.N.Y. 1978), *Lora v. Board of Education of City of New York*, 456 F.Supp. 1211, 1227 (E.D.N.Y.1978).

▮ These distinctions between the state and federal proceedings are determinative of the issue of whether the limitations period governing Neb.Rev.Stat. § 43–666 should be applied to a federal suit under 20 U.S.C. § 1415. State statute of limitations designed to govern judicial proceedings in which the court merely reviews the administrative record to determine if the agency decision is supported by substantial evidence should not be applied to federal proceedings in which the court is empowered to make an independent determination based on evidence not found in the administrative record. *See Warren v. Norman Realty Co., supra,* 513 F.2d at 735. This rule is based on the different policy interests involved in setting the limitations period for each of these proceedings. For example, when the judicial review is limited to a review of the administrative record, as it is under Neb.Rev.Stat. § 43–666, the plaintiff's burden in preparing his case is not great, since an investigation into evidence not presented at the administrative hearing is unnecessary. The burden on a plaintiff suing under 20 U.S.C. § 1415(e)(2), however, would be greater since, generally, an investigation into additional evidence would not only be appropriate but necessary. This disparity indicates that the policy considerations relevant to setting the limitation period for a § 43–666 suit have no application to a suit under 20 U.S.C. § 1415(e)(2). *See Waters v. Wisconsin Steel Works of International Harvester Company, supra,* 427 F.2d at 488; *Metcalf v. Omaha Steel Castings Co., supra,* 476 F.Supp. at 872; *Smith v. Perkin-Elmer Corp., supra,* 373 F.Supp. at 936. Thus, the Court finds that the limitations period governing Neb.Rev.Stat. § 43–666 does not apply to a federal claim under 20 U.S.C. § 1415, since the judicial

review under the state statute is not analogous to the review under 20 U.S.C. § 1415.

This Court is also of the opinion that the thirty day limitation period proffered by the defendants will not best effectuate the federal policy underlying the Education of All Handicapped Children Act. *See Chambers v. Omaha Public School District, supra,* 536 F.2d at 225. One of the Act's goals in providing procedural safeguards is to insure that a child is not placed in an inappropriate educational placement because of an error in his evaluation. *Lora v. Board of Education of City of New York, supra,* 456 F.Supp. at 1227. This purpose will not be served if a parent is given only thirty days within which to assess the validity of the Commissioner's decision.

▮ The parties have not suggested any other state statute of limitations which should be applied here. The Court, however, notes that there are two Nebraska statutes of limitations which would appear to apply. *See* Neb.Rev.Stat. §§ 25–212, 25–219. Under either of these statutes, Rose's claim would have been timely brought. Absent a more appropriate limitations period, the Court finds that Rose's claim is not barred by the statute of limitations.

*Rose's Standing to Challenge Statute*

▮ The defendants contend that Rose lacks standing under Article III of the United States Constitution to challenge the adequacy of the procedures provided in § 43–662 of the Nebraska Statutes. Under Article III, a plaintiff has standing when "the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). Applying this standard to the instant case, the Court finds that Rose has standing under Article III to challenge § 43–662 of the Nebraska Statutes.

**1086**

The Education of All Handicapped Children Act gives the parents of handicapped children a right to an impartial due process hearing on matters relating to the educational placement of their children. Under federal law, any decision made in such a hearing held at the state level must be final except for judicial review. This federal law takes precedent over conflicting state laws.

Rose alleges that the Nebraska procedure denied him his federally guaranteed rights by permitting the Commissioner of Education to become a part of the decisional process in his administrative appeal. Accepting the plaintiff's allegations as true, *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 109, 99 S.Ct. 1601, 1613, 60 L.Ed.2d 66 (1979), the Court finds that this denial of Rose's federally protected rights is a sufficient injury in fact to satisfy the requirements of Article III. Furthermore, a favorable decision in this case will redress the injury Rose has suffered, since he will be able to obtain the impartial hearing to which he is entitled. Thus, this Court finds that Rose has standing under Article III to challenge Neb.Rev.Stat. § 43–662.

*Exhaustion of Administrative Remedies*

The incident which precipitated Monahan's involvement in the instant action was the Omaha School Board's refusal to fund Daniel's education at George Norris. Shortly after the Board's decision, Monahan filed this suit under 20 U.S.C. § 1415, challenging the adequacy of the Nebraska administrative procedure for reviewing the placement of handicapped children. Prior to filing suit, however, Monahan never attempted to contest the Board's decision by utilizing the administrative hearing provided by the Nebraska statutes. The defendants contend that this failure to exhaust the administrative procedures available under Nebraska law prevents Monahan from challenging these procedures under 20 U.S.C. § 1415.

The Education of All Handicapped Children Act gives federal district courts jurisdiction to review placement decisions made in the state's due process hearings. 20 U.S.C. § 1415(e)(2). This grant of jurisdiction empowers the Court not only to determine whether the placement decision was correct, but also to determine whether the state procedure denied the plaintiff of his procedural rights under the Act. *Loughran v. Flanders*, 470 F.Supp. 110, 113 (D.Conn.1979). Generally, a party desiring to assert the jurisdiction provided by this Act must first exhaust the state's administrative procedures. Notwithstanding the general rule, a number of courts have held that exhaustion of state administrative procedures is not required when exhaustion would be futile. *Armstrong v. Kline*, 476 F.Supp. 583, 601–602 (E.D.Pa.1979); *Harris v. Campbell*, 472 F.Supp. 51, 53–54 (E.D.Va. 1979); *Loughran v. Flanders, supra*, 470 F.Supp. at 112; *Campochiaro v. Califano*, No. H–78–64, slip op. at 4 (D.Conn. May 18, 1978); *New York State Association for Retarded Children, Inc. v. Carey, supra*, 466 F.Supp. at 486.

Given the nature of Monahan's claim, his pursuit of administrative relief would be a futile gesture. The gravamen of Monahan's complaint is that the Nebraska statutes create an administrative procedure which violates the mandates of the federal law. In essence, the plaintiff claims that he is faced with an ironclad procedure which the Nebraska statutes require to be followed in all hearings held to review the placement of a handicapped child. Such a claim cannot be resolved in the due process hearings themselves, since the persons conducting the hearings are without authority to ignore the procedures specifically mandated by state law. Thus, it would be a futile gesture for Monahan to attempt to resolve this dispute in an administrative hearing. The Court therefore finds that Monahan need not exhaust his state administrative remedies before bringing an action under 20 U.S.C. § 1415 to challenge the propriety of the administrative procedure provided by Nebraska law.

*Abstention*

Upon the Court's request, the defendants have submitted a brief address-

ing the issue of abstention. There are at least three different doctrines under which a court may abstain from exercising jurisdiction conferred upon it by statute. *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 814–17, 96 S.Ct. 1236, 1244–46, 47 L.Ed.2d 483 (1976). Of these doctrines, only the *Pullman*-type abstention has been offered by the defendants as a basis for abstention in this case. *See Railroad Commission of Texas v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The Court will, therefore, limit its consideration of abstention in this opinion to a discussion of whether the *Pullman* doctrine requires abstention in this case.

Under the *Pullman* doctrine, abstention "is appropriate where the state laws are uncertain, and the uncertainty is such that a determination by the state court may obviate the need for deciding the federal constitutional question." *Herald Co. v. McNeal*, 553 F.2d 1125, 1129 (8th Cir. 1977). The purpose of this type of abstention is the avoidance of "the friction of a premature constitutional adjudication." *Railroad Commission of Texas v. Pullman, supra*, 312 U.S. at 500, 61 S.Ct. at 645. Thus, the core of the *Pullman* doctrine is the requirement that a federal court should refrain from deciding federal constitutional issues until uncertain questions of state law have been resolved. *D'Iorio v. County of Delaware*, 592 F.2d 681, 685 (3rd Cir. 1978).

▇ The plaintiffs' complaint alleges that a conflict exists between Nebraska and federal law. Although such a claim is based on the Supremacy Clause of the United States Constitution, it is not the type of constitutional claim to which the *Pullman* doctrine was designed to apply.

It is true that technically a claim that a federal statute controls under the Supremacy Clause is a constitutional issue . . . . The claim that a federal statute controls is essentially an exercise in construing the federal statute. Once its meaning has been determined, application

of the Supremacy Clause poses no novel constitutional problem. The policy against unnecessary decision of constitutional questions does not reach unnecessary construction of statutes. Thus while one of the other abstention doctrines might justify abstaining in a Supremacy Clause case, abstention should not be ordered on Pullman grounds.

14 C. Wright, Miller, and Cooper, Federal Practice and Procedure § 4252, at 455 (1978).

This analysis seems particularly appropriate in light of a recent Supreme Court case in which the Court held that in the context of 28 U.S.C. § 2281, Supremacy Clause claims are not to be equated with other constitutional claims. *Swift & Co. v. Wickham*, 382 U.S. 111, 126–29, 86 S.Ct. 258, 266–68, 15 L.Ed.2d 194 (1965). This Court therefore finds that *Pullman*-type abstention has no application in this case.

▇ Assuming that the *Pullman* doctrine should apply to constitutional claims under the Supremacy Clause, this Court is still of the opinion that this abstention doctrine has no application in this case. The *Pullman* doctrine only applies when the state law in question is susceptible to a reasonable interpretation that would avoid or alter the constitutional issue raised by the plaintiff's complaint. In the instant case, there is no reasonable interpretation of Nebraska law which would reconcile the federal and state procedures. The plain language of the state statute indicates that the Commissioner of Education has at least some discretionary authority over the hearing officer's decision. *See* Neb.Rev.Stat. § 43–662. Any grant of such discretionary authority to the Commissioner conflicts with the federally mandated procedures.[3] Since this conflict cannot be avoided by any reasonable interpretation of the state law, this Court finds that *Pullman*-type abstention should not apply in this case, even assuming the doctrine applies to Supremacy Clause cases. *See generally Zbaraz v.*

---

3. This Court's analysis of the proper interpretation of Neb.Rev.Stat. § 43–662 is found in Part

V of this Memorandum Opinion.

*Quern,* 572 F.2d 582, 586 (7th Cir. 1978); *Valley Family Planning v. State of North Dakota,* 475 F.Supp. 100, 102 (D.N.D.1979).

#### IV.

Part of the preliminary relief sought by the plaintiffs is an order requiring the defendants to provide Marla and Daniel with an educational placement pending resolution of this suit. The provisional placement of these children during this litigation is governed by the Education of All Handicapped Children Act:

> During the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child *shall* remain in the *then current educational placement* of such child . . until all such proceedings have been completed. (emphasis supplied).

> 20 U.S.C. § 1415(e)(3).

This provision is designed to preserve the status quo pending resolution of judicial or administrative proceedings held under the Act. 45 C.F.R. § 121a.513 (1979). *See New York State Ass'n for Retarded Children, supra,* 466 F.Supp. at 486. In essence, it is like an automatic preliminary injunction which maintains the child's then current educational placement. However, unlike a preliminary injunction, the statute replaces "the Court's discretionary consideration of irreparable harm and likelihood of success on the merits with an absolute rule in favor of the status quo." *Gargani v. The School Committee of Cranston,* No. 77–0612, slip op. at 6 (D.R.I. May 4, 1978). The Court is therefore without the power to place a child in any provisional placement except for his then current educational placement. *Campochiaro v. Califano,* No. H–78–64, slip op. at 10 (D.Conn. May 18, 1978). Thus, to the extent that plaintiffs seek an interim placement other than Marla's and Daniel's then current educational placement, the request must be denied.

Although the Act simplifies the determination of where to place a child during litigation, two issues remain to be resolved in the instant case. First, the Court must ascertain what is Marla's and Daniel's "then current educational placement." Unfortunately, this determination is somewhat unguided since this term is not defined in the Act. Having determined the child's then current placement, the Court must next decide who is to pay the costs of this placement during the proceedings. The resolution of these issues depends on facts unique to each plaintiff. The Court will therefore discuss each plaintiff's claim separately.

#### Plaintiff Monahan

The factual setting of the Monahan claim is unique. During the 1978–1979 school year, Daniel was attending the Madonna School, a private school for the mentally retarded. This placement was apparently acceptable to both the school district and Daniel's parents. The cost of tuition at Madonna was paid by the Omaha School District.

By June of 1979, Daniel's physical condition had deteriorated to the point that he had become confined to a wheelchair. Since Madonna was not equipped to educate wheelchair bound students, Daniel was forced to leave the school at the end of the 1978–1979 school year. It should be emphasized that this change of placement was necessitated by factors beyond the control of either the Omaha School District or the Monahans. In any event, it would appear that at this point, Daniel was without an educational placement since he could not return to Madonna, his former educational placement.

Upon learning of Daniel's termination at Madonna, Monahan obtained a new educational evaluation of Daniel from the Millard School District. This evaluation recommended George Norris Elementary School as an appropriate educational placement for Daniel. Monahan then took this recommendation to Dr. Samuelson and requested that the Omaha School District pay for Daniel's education at Millard. Until this request was made in July of 1979, it does not appear that the Omaha School District had been informed that Daniel could not return to the Madonna School. In any event, the school district refused to pay for the Millard placement.

■ This factual setting presents a difficult question of the proper interpretation of the term "then current educational placement." Normally, the then current placement is determined at the time a complaint is submitted to the local school district, since such a complaint would be the beginning of an administrative proceeding provided by the Act. *Stuart v. Nappi*, 443 F.Supp. 1235, 1241 (D.Conn.1978). *See* 20 U.S.C. § 1415(b)(1)(E). However the factual setting of the Monahan claim does not fit this normal situation. When Monahan in July of 1979 requested the Omaha School District to pay for the Millard placement, Daniel had no educational placement. At that time, Daniel could not return to his former placement at Madonna because of his physical condition. In addition, the proposed placement at George Norris was merely a recommendation which had never been implemented.

The Court, however, need not resolve the issue of what is Daniel's then current educational placement because neither party objects to Daniel's continued placement at George Norris. Monahan has requested that this Court permit Daniel to remain in the Millard School and has argued that 20 U.S.C. § 1415(e)(3) requires such a placement. For their part, the defendants have raised no objections to the George Norris placement pending resolution of this suit. Since the parties do not object to Daniel's placement at George Norris during the pendency of this suit, the Court will treat this placement as Daniel's then current educational placement under 20 U.S.C. § 1415(e)(3).

The designation of George Norris as Daniel's then current educational placement does not resolve the issue of who should pay for this placement during the instant litigation. For the reasons discussed below, this Court is of the opinion that Monahan should continue to pay the costs of this placement.

■ The Act prohibits any change in a child's then current educational placement once a proceeding under the Act has been initiated. The purpose of this requirement is to insure that the status quo is maintained during pendency of a proceeding. Thus, neither party is permitted to make a unilateral change in the education of the child. Moreover, the maintenance of the status quo requires that the school district *continue* to finance an educational placement which it had financed prior to the commencement of the proceeding. The operation of this requirement is illustrated by the following hypothetical situation.

Assume that prior to any proceedings under the Act, a child is being educated in educational placement "A" at school district expense. The school district then gives the parents notice of a proposed change in placement, and the parents file a complaint under the Act. In such a situation, the Act requires that this child remain in placement "A" and that the school district continue to pay for a child's education in placement "A" as it had done previously. Any refusal by the school district to continue payment would amount to a change in placement prohibited by the Act. *See Gargani v. The School Committee of the City of Cranston*, No. 77-0612, slip op. at 7 (D.R.I. May 4, 1978). Thus, the maintenance of the status quo under the Act requires not only that a child be educated in the same placement during any proceeding under the Act, but also that no change in the financing of that placement occur.

■ Unlike the hypothetical situation, the maintenance of the status quo in the Monahan case does not require that the defendants pay for Daniel's education pending resolution of this litigation. The status quo in the instant case is Daniel's placement at George Norris paid for by Daniel's father. In contrast to the hypothetical situation, the Omaha School District had at no time paid the costs of the George Norris placement. Thus, this case does not present a situation where the school district has refused to continue to provide financial assistance which it had given prior to the filing of the complaint. To maintain the status quo in the instant case, Daniel should remain in his then current placement at George Norris and his father should continue to pay the costs of the placement as he

has done in the past. Requiring the Omaha School District to finance the George Norris placement would be a change in the status quo, since such payments had never been provided in the past.

*Plaintiff Rose*

The factual setting of the Rose claim is similar to the hypothetical situation set out above. Prior to the 1978–79 school year, Marla was attending Beveridge Junior High School. In June of 1978, Marla's parents received notice of a proposed change of placement. The Roses were not satisfied with this proposed change and filed a complaint with the local school authorities in the summer of 1978. Although various administrative and judicial proceedings followed the filing of this complaint, the facts presented here are sufficient to determine Marla's then current educational placement under 20 U.S.C. § 1415(e)(3).

Under § 1415(e)(3), Marla is entitled to remain in her then current educational placement throughout any of the proceedings which are held pursuant to the Act. The then current educational placement is determined at the time that a complaint is filed under the Act. *Stuart v. Nappi, supra,* 443 F.Supp. at 1241. In the instant case, Marla's educational placement at the time her father filed a complaint with the Omaha School District was at the Beveridge Junior High School, where she attended both regular and special education classes. The cost of this placement was borne by the Omaha School District. Thus, this placement is her then current educational placement under § 1415(e)(3) and she is entitled to remain in this placement throughout all the proceedings held under the Act. In addition, the cost of this placement shall be borne by the Omaha School District.

This holding which requires Marla to be readmitted to the Omaha public schools does not mean that Marla must be placed in Beveridge Junior High. If other schools can provide the same type of education that she received at Beveridge, then placement in those schools would satisfy 20 U.S.C. § 1415(e)(3). *See* Stipulation of the Parties in CV 79–0–300 [Exhibit # 6].

V.

Aside from requesting that this Court provide for the interim placement of Marla and Daniel, the plaintiffs seek a preliminary injunction appointing an impartial hearing officer to determine an appropriate placement for these children. Unlike the request for an interim placement, the resolution of this issue is governed by the standard for the granting of preliminary injunctions.

The purpose of a preliminary injunction is to maintain the status quo pending resolution of the litigation. *Jordan v. Wolke,* 593 F.2d 772, 773 (7th Cir. 1978). Generally, a preliminary injunction will fulfill this function by prohibiting the defendant from taking harmful action while a suit is being litigated. However, when the plaintiff will suffer irreparable harm because of the defendant's inaction, a court may grant a mandatory preliminary injunction requiring the defendant to take certain affirmative action pending resolution of the litigation. *See* 7 *Moore's Federal Practice* ¶ 65.04[1] (1979). Traditionally, courts have disfavored mandatory preliminary injunctions and have granted them in only rare situations. *See Harris v. Wilters,* 596 F.2d 678, 680 (5th Cir. 1979); *Jordan v. Wolke, supra,* 593 F.2d at 773–74; *Jacobson & Co. v. Armstrong Cork Company,* 548 F.2d 438, 441, 441 n.3 (2d Cir. 1977). Such injunctions are only granted when the moving party has made a clear showing that the facts and law entitle him to preliminary relief. *Flintkote Co. v. Blumenthal,* 469 F.Supp. 115, 125–26 (N.E.N.Y.1979), *aff'd* 596 F.2d 51 (2d Cir. 1979). *Bricklayers, Masons, Marble and Tile Setters, Protective and Benevolent Union v. Lueder Construction Company,* 346 F.Supp. 558, 561 (D.Neb.1972).

The standard for determining whether a party is entitled to preliminary relief is well settled in this Circuit. A party is not entitled to a preliminary injunction unless he makes a showing of either "(1)

probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Fennell v. Butler,* 570 F.2d 263, 264 (8th Cir. 1978), *cert. denied* 437 U.S. 906, 98 S.Ct. 3093, 57 L.Ed.2d 1136 (1978). Applying this standard to the instant case, the Court must determine whether the plaintiffs have made a sufficient showing to justify the granting of a mandatory preliminary injunction.

*Merits of the Plaintiffs' Claim*

Before issuing a preliminary injunction, the Court must consider the plaintiffs' chances of success on the merits. In the instant case, this inquiry will focus on the merits of the plaintiffs' claim that the Nebraska statutory procedure for administrative appeals of local school districts educational placement decisions conflicts with federal law. For the reasons discussed below, this Court finds that the plaintiffs have clearly raised "sufficiently serious questions going to the merits to make them a fair ground for litigation," and therefore that they have made a sufficient showing on the merits to justify a preliminary injunction. *Fennell v. Butler, supra,* 570 F.2d at 264.

The Education of All Handicapped Children Act provides specific procedural safeguards which must be adopted by states receiving funds under the Act. These safeguards govern educational proceedings in Nebraska, since it is a recipient of funds under the Act. Thus, any Nebraska law which is inconsistent with these federally mandated procedures is superseded by the federal law. *See Robert M. v. Benton,* No. 79–4007 (N.D.Iowa August 13, 1979); *Compochiaro v. Califano,* No. H–78–64 (D.Conn. May 18, 1978).

Under the Act, any parent who complains about the educational placement of a handicapped child shall be given an opportunity for an impartial due process hearing. 20 U.S.C. § 1415(b)(2). These due process hearings may be held at either the state or local level, whichever is designated by state law. 20 U.S.C. § 1415(b)(2). Under Nebraska law, the due process hearings are held at the state level. Neb.Rev.Stat. § 43–662. When the due process hearings are held at the state level, the Act provides that any decision made in that hearing shall be final, subject only to judicial review. 20 U.S.C. § 1415(e)(1).

Comparing the federal procedural scheme to that of Nebraska, the Court finds an important inconsistency between the state and federal procedures. The Nebraska law provides that the due process hearings shall be conducted by the State Department of Education using impartial hearing officers. Neb.Rev.Stat. §§ 43–662, 43–663. However, in contrast to the federal guidelines, a final decision is not made in the due process hearing. Rather, the hearing officer merely prepares a report which is then delivered to the Commissioner of Education. This report contains the hearing officer's "findings of facts based on the evidence presented and decisions based on such findings." Neb.Rev.Stat. § 43–662. Once the Commissioner receives the report, the Nebraska statute provides:

> After reviewing such findings and decisions the Commissioner of Education shall then recommend or direct such action as may be necessary.

> Neb.Rev.Stat. § 43–662.

Based on this statutory language, it appears that the Commissioner of Education has the discretionary authority to accept, reject or modify the decision made in the due process hearing. Such discretion conflicts with the federal requirement that the decision made in the due process hearing shall be final except for judicial review. 20 U.S.C. § 1415(e)(1). *See Matter of "A" Family,* Mont., 602 P.2d 157, 166–67 (1979).

The defendants, however, contend that this interpretation of the Commissioner's authority is erroneous because it conflicts with the legislative history of the statute. To support this contention, the defendants have offered into evidence the legislative history of L.B. 871 which was later codified

**1092**

in part at Neb.Rev.Stat. § 43–661 *et seq.* This history contains only one very brief discussion of the procedural framework created by L.B. 871:

> The third amendment applies to the hearing and the appeals board which we adopted two years ago to bring us into compliance with the 94–142. We must provide for hearing officers under the Department of Education.
>
> The appeals board stays intact but we are providing for hearing officers as 94–142 says we must do.
>
> *Nebraska Legislative Floor Debate on L.B. 871,* 85th Legis., 2d Sess. 09246 (1978) (statement of Senator Koch).

This passage indicates that the Unicameral's purpose in enacting L.B. 871 was to comply with the provisions of the Education of All Handicapped Children Act and thereby to make Nebraska eligible for funding under the Act. *See Nebraska Legislative Floor Debate on L.B. 871,* 85th Legis., 2d Sess. 08706 (1978) (statement of Senator Koch). Based on this expression of legislative intent, the defendants argue that this Court must interpret the scope of the Commissioner's authority under Neb.Rev.Stat. § 43–662 in a manner which makes the state statute consistent with federal law. Thus, they conclude that Neb.Rev.Stat. § 43–662 should be interpreted to require that the Commissioner enforce the hearing officer's decision without alteration.

This Court refuses to adopt the defendants' suggested analysis based on the statute's legislative history. Beyond indicating the Unicameral's general intent, the legislative history of this statute provides little or no aid in determining the scope of the Commissioner's authority. The history contains no indication of the legislature's understanding of how broad the Commissioner's authority under § 43–662 would be. In light of the weaknesses in the legislative history, this Court refuses to strain its interpretation of the plain language of Neb. Rev.Stat. § 43–662 in an effort to conform with this nebulous statement of legislative intent. The Court is of the opinion that the intended scope of the Commissioner's authority is best determined by examining the language of the statute itself.

When interpreting a statute, the Court examines the language of the statute to determine the legislature's intent. In making this inquiry, the Court should attempt to find a *reasonable* interpretation which supports the validity of the statute. *See Johnson v. Exon,* 199 Neb. 154, 157, 256 N.W.2d 869, 871 (1977). Such an interpretation should be based on the plain and ordinary meaning of the statute's language. Moreover, "no sentence, clause or word should be rejected as meaningless or superfluous." *Weiss v. Union Insur. Company,* 202 Neb. 469, 473, 276 N.W.2d 88, 92 (1979). Applying these rules of construction to the instant case, this Court finds that limiting the Commissioner's authority as suggested by the defendants would not be a reasonable interpretation of the plain language of Neb.Rev.Stat. § 43–662.

The plain language of § 43–662 clearly indicates that the Commissioner was intended to do more than merely rubber stamp the hearing officer's decision. In pertinent part, the statute provides:

> After *reviewing* [the hearing officer's] findings and decisions, the Commissioner of Education shall then recommend or direct such action as may be *necessary.* (emphasis supplied)
>
> Neb.Rev.Stat. § 43–662.

This language clearly gives the Commissioner the authority to *review* the hearing officer's decision and to direct such action as may be *necessary.*

Despite this language, the defendants contend that Neb.Rev.Stat. § 43–662 requires the Commissioner to implement the hearing officer's decision without alteration. The adoption of this interpretation, however, would make superfluous the statutory language granting the Commissioner authority to review the hearing officer's decision since he would be obligated to implement the decision unchanged, regardless of the result of the review. Similarly, the defendants' interpretation makes the term "necessary" meaningless, since the Commissioner would have to implement the hearing

officer's decision whether it was necessary or not. Thus, this Court rejects the defendants' interpretation which deprives the Commissioner of all discretion to modify a hearing officer's decision.

The only interpretation which gives meaning to all the language of Neb.Rev. Stat. § 43–662 is one which gives the Commissioner some discretionary authority over the hearing officer's decision. The statute plainly states that the Commissioner is to review the hearing officer's decision and is to direct any necessary action. At a minimum, this language should be read as giving the Commissioner authority to review the hearing officer's decision, and then to determine what action is necessary.

This interpretation of the Nebraska statute is further supported by Nebraska Department of Education Rule 55. This rule governs special education appeals and provides:

> After the completion of a hearing, the hearing officer shall prepare a report setting forth the petition, the answer, the substance of the evidence presented at the hearing, his findings of fact, and his decision and *recommendation for action*. Rule 55(8)(a) of the Nebraska Department of Education.

This rule clearly indicates that the hearing officer does not have the authority to make a final decision on the issue of what action should be taken in a particular case. Rather, he is limited to making a "recommendation for action." [4] This recommendation is then conveyed to the Commissioner, who then directs such action as may be "necessary and proper." Rule 55(8)(b). These rules read in combination show that the Commissioner, not the hearing officer, makes the final decision on what action should be taken following a due process hearing. *Compare Matter of "A" Family, supra,* 602 P.2d at 166–67 (where an overbroad statute was corrected by education department rules which made clear that the hearing officer's decision was final).

■ Any interpretation of Neb.Rev. Stat. § 43–662 which gives the Commission-

er authority to modify the hearing officer's decision creates a conflict between the Nebraska statute and the federal requirement that the hearing officer's decision shall be final. This, however, is the only reasonable interpretation of the statute's plain language and of the rules of the Department of Education. This Court, therefore, finds that the plaintiffs have raised sufficiently serious questions as to the validity of the Nebraska procedure to make them fair grounds for litigation.

*Hardship on the Plaintiffs*

■ Notwithstanding the meritorious nature of the plaintiffs' claims, the Court cannot issue a preliminary injunction without considering the hardships which would befall the plaintiffs if preliminary relief was not granted. Under either preliminary injunction standard provided in *Fennell*, a preliminary injunction is not appropriate unless the plaintiffs show that they would suffer irreparable harm if relief was denied. *See Frejlach v. Butler,* 573 F.2d 1026, 1027 n.4 (8th Cir. 1978). Since the plaintiffs are not identically situated with respect to the hardships they would suffer, the Court will discuss the hardships of each separately.

If preliminary relief is not granted in the Monahan case, Daniel will remain in the George Norris placement and his father will continue to pay the costs of this placement pending resolution of this litigation. The parties apparently agree that Daniel's educational development will not be harmed if he remains at George Norris, since that placement provides him with an appropriate education. Although Daniel's education will not be harmed if preliminary relief is not granted, Daniel's father will be harmed monetarily, since he will continue to pay the cost of this placement.

■ Monetary damage which is recoverable upon completion of the litigation is not generally considered to be irreparable harm which justifies the granting of preliminary relief. *Ralls v. Wolfe,* 321 F.Supp. 867, 868 (D.Neb.1971), *aff'd* 448 F.2d 778 (8th Cir. 1971). This is especially true when the

---

4. The language used by the hearing officer in his report in the Rose case also indicates that

his decision is a recommendation. [Exhibit # 5, p. 46–47, 53–54].

plaintiff is seeking a mandatory preliminary injunction. *Jacobson & Co., Inc. v. Armstrong Cork, supra,* 548 F.2d at 441 n.3. This Court must therefore determine whether Monahan can recover the cost of the George Norris placement if he prevails on his claim under the Education of All Handicapped Children Act.

The Education of All Handicapped Children Act specifically creates a private cause of action which may be brought in federal court. In resolving such lawsuits, the Court is empowered by the Act to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). This language indicates that the Court has broad authority in granting relief under the Act. This conclusion is reinforced by the Act's legislative history, which states that "the court . . . shall grant *all* appropriate relief." *Joint Explanatory Statement of the Committee of Conference,* S.Rep.No.94–455, 94th Cong., 1st Sess., at 50, *reprinted in* U.S.Code Cong. and Admin.News, at p. 1503 (1975). This language in the Act and its legislative history strongly suggest that the Court may award damages under the Act when such relief is deemed to be appropriate. *Boxall v. Sequoia Union High School District,* 464 F.Supp. 1104, 1112 (N.D.Cal.1979). Moreover, recovery of the cost of tuition in the instant case would further the Act's purpose. This expenditure for tuition was allegedly made because of the defendant's failure to comply with the Act's procedural requirements. If these claims are proved, recovery of this cost will further the Act's purpose of ensuring that all handicapped children receive a free appropriate education. In other words, the defendants would be required to pay the costs of Daniel's education and thus provide Daniel with a free education as the Act requires. *Compare Loughran v. Flanders, supra,* 470 F.Supp. at 115 (which held that a plaintiff could not recover damages for emotional injury or future lost earnings because such recovery would hinder fulfillment of the Act's purpose). Thus, this Court finds that if Monahan proves his claim under the Act, an award of damages may be appropriate to compensate him for the cost of the George Norris placement.

Given the existence of a damages remedy under 20 U.S.C. § 1415(e)(2), this Court is of the opinion that Monahan has not made a sufficient showing of irreparable harm to justify granting a preliminary injunction. This holding is based on the fact that the evidence fails to show that an award of damages to Monahan would not be appropriate under 20 U.S.C. § 1415(e)(2), assuming Monahan proves the merits of his claim. Thus, there has been no showing that Monahan will suffer an irreparable harm for which no adequate remedy at law is available. *Frejlach v. Butler, supra,* 573 F.2d at 1027. In addition, the Court finds that the existence of this monetary relief indicates that the balance of hardships do not tip decidedly in Monahan's favor. In light of these findings, Monahan's request for preliminary relief must be denied.

Unlike Daniel Monahan, Marla Rose will suffer irreparable harm if a preliminary injunction is not granted. This harm will be the result of Marla's educational placement during this litigation. Pending resolution of this lawsuit, Marla must remain in her then current educational placement in the Omaha School District. However, according to Dr. Samuelson's testimony, this placement will not enable Marla to make any educational progress. Thus, each day spent in this placement is a day which cannot be utilized to further her educational development. This type of loss cannot be compensated for by money damages, and therefore amounts to irreparable harm. *Ralls v. Wolfe, supra,* 321 F.Supp. at 868. Granting preliminary relief here will cut to a minimum the days of educational progress which Marla will lose. This Court, therefore, concludes that under either preliminary injunction test, Rose has made a sufficient showing of irreparable harm to warrant this Court issuing a mandatory preliminary injunction. *See Compochiaro v. Califano,* No. H–78–64, slip op. at 9 (D.R.I. May 18, 1978).

*Conclusion*

Both plaintiffs seek a preliminary injunction appointing an impartial hearing officer

to determine an appropriate educational placement for their children. Applying the standards found in *Fennell,* this Court is of the opinion that the plaintiffs have raised sufficient questions concerning the propriety of the Nebraska procedure to satisfy either *Fennell* test. Notwithstanding this showing, Monahan is not entitled to preliminary relief because of his insufficient showing of irreparable harm. Rose, however, has satisfied the irreparable harm element of the *Fennell* tests and thus shall be granted preliminary relief.

Although Rose is entitled to a preliminary injunction, the issue remains of what form of relief is appropriate here. In his complaint, Rose has requested that this Court appoint a hearing officer to conduct the hearing in his daughter's case. The Court is of the opinion that it would be inappropriate for this Court to make such an appointment. Rather, the Court shall order the Commissioner of Education to appoint an impartial hearing officer to hear Rose's case. The Commissioner, however, will be ordered to abstain from any review of the hearing officer's decision, and shall be required to implement such decision without modification.

An order will be filed contemporaneously with this Memorandum Opinion.