Ernest E. BURGESS et al., Plaintiffs,

v.

M/V TAMANO et al., Defendants and
Third-Party Plaintiffs,

v.

STATE OF MAINE et al., Third-
Party Defendants.

STATE OF MAINE et al., Plaintiffs,

v.

M/V TAMANO et al., Defendants.

Mark SNOW et al., Plaintiffs,

v.

M/V TAMANO et al., Defendants and
Third-Party Plaintiffs,

v.

STATE OF MAINE et al., Third-
Party Defendants.

Calvin E. DOUGHTY, Jr., et al.,
Plaintiffs,

v.

M/V TAMANO et al., Defendants and
Third-Party Plaintiffs,

v.

STATE OF MAINE et al., Third-
Party Defendants.

Civ. Nos. 13-111, 13-114, 13-115
and 13-120.

United States District Court,
D. Maine, S. D.

Feb. 26, 1974.

Theodore H. Kurtz, John A. Graustein, Portland, Me., for Ernest E. Burgess, John S. Norton and Alberto L. DiMillo, and others.

Norman S. Reef, Portland, Me., Morris D. Katz, Boston, Mass., for Marshall Madsen.

Warren E. Winslow, Portland, Me., for Warren I. and Barbara S. Paul.

Thomas R. McNaboe, Benjamin Thompson, James P. Lansing, Portland, Me., for M/V Tamano and Messrs. Wilhelmson.

Ralph I. Lancaster, Jr., Portland, Me., for Texaco, Inc.

Allen vanEmmerik, Emmet B. Lewis, Admiralty & Shipping Section, Dept. of Justice, Washington, D.C., Peter Mills, U.S. Atty., Portland, Me., for the United States.

Jon A. Lund, Atty. Gen., Martin L. Wilk, Asst. Atty. Gen., Augusta, Me., for State of Maine.

Charles W. Smith, Saco, Me., James R. Flaker, Portland, Me., for Mark Snow, Frederick Ahearn and Wild Acres Tent and Trailer Park, Inc., and others.

John A. Mitchell, Portland, Me., Joseph C. Smith, John F. O'Connell, New York City, for Charles C. Dunbar, Jr. and Portland Pilots, Inc.

Michael B. Latti, Robert S. Wolfe, Boston, Mass., Frederick T. McGonagle, Gorham, for Calvin E. Doughty, Jr. and Anthony L. Gibbons.

## OPINION AND ORDER OF THE COURT

GIGNOUX, District Judge.

These four consolidated actions arise out of the discharge into the waters of Casco Bay of approximately 100,000 gallons of Bunker C oil from the tanker M/V TAMANO when, while passing through Hussey Sound en route to the port of Portland early on the morning of July 22, 1972, she struck an outcropping of "Soldier Ledge." Among those named as defendants in all actions are the TAMANO, her owners and her captain (hereinafter jointly referred to as "TAMANO"). In Civil No. 13–114, the State of Maine and its Board of Environmental Protection (hereinafter jointly referred to as "the State") seek to recover damages claimed to have been sustained by the State as a result of the spill.[1] Civil Nos. 13–111, 13–115 and

1. The damages sought by the State in Civil No. 114 fall in three distinct categories: (1) the State in its proprietary capacity seeks to recover for damage to property, such as state parks, which the State itself owns, including the land under the waters of its marginal seas; (2) the Board of Environmental Protection, by virtue of the

13–120 are class actions brought on behalf of owners of shore property, boat owners, commercial fishermen and commercial clam diggers alleged to have been damaged by the spill.[2]  All actions assert liability on theories of negligence, unseaworthiness, trespass and nuisance, as well as under Section 13 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 407, and Section 11(b)(2) of the Water Quality Improvement Act of 1970, 33 U.S.C. § 1161(b)(2).  They invoke the admiralty and maritime jurisdiction of the federal courts pursuant to 28 U.S.C. § 1333(1) and 46 U.S.C. § 740.

By counterclaim in Civil No. 13–114 and by third-party complaints in Civil Nos. 13–111, 13–115 and 13–120, TAMANO seeks to recover additional cleanup costs and other damages claimed to have been incurred by TAMANO as a result of the alleged failure of the State and its agencies to perform certain duties allegedly owed by the State to TAMANO in connection with the cleanup of the spill.  The claims TAMANO asserts against the State, which are set forth in identical counts in the counterclaim and third-party complaints, are: (1) in Count I, the alleged failure of the State to comply with and implement its Oil Contingency Plan published pursuant to the Maine Oil Discharge Prevention and Pollution Control Act, *supra* n.1; (2) in Count II, the alleged failure of the State to provide adequate sites for the dispos-

al of debris accumulated in cleaning up the spill; (3) in Count III, the alleged refusal of the State to approve sites found by TAMANO for the disposal of debris from the cleanup; and (4) in Count IV, the alleged refusal of the State to reopen clam flats claimed by TAMANO not to have been affected by the spill.  In addition, a fifth count, which appears only in the third-party complaints, seeks to hold the State directly liable to the class action plaintiffs by reason of the derelictions previously alleged.

Presently before the Court are the State's motions to dismiss the counterclaim and third-party claims against it on the grounds that the Eleventh Amendment to the Constitution bars these claims, and, alternatively, that they fail to state a claim upon which relief can be granted.  For the reasons to be stated, the Court holds that the claims against the State are barred by the Eleventh Amendment and that, in any event, they fail to state any claim upon which relief can be granted.

## I.

### *Eleventh Amendment Immunity*

It is settled that the Eleventh Amendment bars suits brought by individuals in the federal courts against an unconsenting State.[3]  TAMANO apparently

---

authority granted it by the Oil Discharge Prevention and Control Act, 38 M.R.S.A. § 541 et seq. (1972 Supp.), sues to recover all sums expended or to be expended by it in payment of third-party damage claims; and (3) the State in its *parens patriae* capacity seeks to recover for damage to its coastal waters and the marine life therein. In a prior ruling, Maine v. M/V TAMANO, 357 F.Supp. 1097 (D.Me.1973), the Court has held that the complaint states a viable *parens patriae* cause of action and has denied TAMANO's motion to dismiss the *parens patriae* claim.

2. The Court has previously held that the commercial fishermen and clam diggers are entitled to recover for established pecuniary losses resulting from the spill and has denied TAMANO's motions to dismiss these

claims.  Burgess v. M/V TAMANO, 370 F. Supp. 247 (D.Me.1973).

3. The Eleventh Amendment provides:
   The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
   Although the Amendment does not in terms bar a suit by a State's own citizens, it is established that an unconsenting State is immune from federal court suits by its own citizens, as well as by citizens of another State. Hans v. Louisiana, 134 U.S. 1, 10 S. Ct. 504, 33 L.Ed. 842 (1889); Parden v. Terminal R. Co., 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964); Employees of Department of Public Health and Welfare of

concedes this, but contends that the State of Maine has waived its immunity, and thereby has consented to the jurisdiction of this Court of the claims here asserted.

TAMANO advances two theories of waiver. First, relying on principles enunciated in Parden v. Terminal R. Co., *supra* n.3, and Petty v. Tennessee-Missouri Bridge Commission, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959), TAMANO argues that the State, by enacting the Maine Oil Discharge Prevention and Control Act and by promulgating the State Oil Contigency Plan pursuant to the Act, has entered a sphere of federal regulation, established as such by virtue of the Water Quality Improvement Act of 1970, and, therefore, that the State has consented to the jurisdiction of the federal court over the present claims.

In *Parden,* a suit was brought against a state-owned railroad to recover damages under the Federal Employers' Liability Act. That statute specifically created a federal cause of action against "every" interstate rail carrier in favor of its injured employees. The Supreme Court held that Congress intended to include state-owned railroads within the coverage of the Act, and that Alabama by entering into interstate commerce as a rail carrier waived its immunity from suit and "necessarily consented to such suit as was authorized by that Act." 377 U.S. at 192,[4] 84 S.Ct. at 1213.

*Petty* was an action under the Jones Act to recover for the death of a seaman on a Mississippi River ferry boat owned by the defendant, an interstate agency created pursuant to an interstate compact entered into with the consent of Congress pursuant to the Compact Clause of the Constitution. The Supreme Court held that by the terms of the compact, which specifically authorized the agency "to sue and be sued," and of the proviso that Congress had attached in approving it, which expressly reserved federal court jurisdiction in suits against the agency, the compact States had waived their Eleventh Amendment immunity. The Court's holding was based on the principle that the States by entering a federally regulated area "assume the conditions that Congress under the Constitution attached." 359 U.S. at 281–282, 79 S.Ct. at 790.

Both *Parden* and *Petty* establish that "when a State leaves the sphere that is exclusively its own and enters into activities subject to congressional regulation, it subjects itself to that regulation as fully as if it were a private person or corporation." 377 U.S. at 196, 84 S.Ct. at 1215 In *Parden,* however, and within the last year in Employees of Department of Public Health and Welfare of Missouri v. Department of Public Health and Welfare of Missouri, *supra* n.3, in which the Supreme Court held that the Eleventh Amendment barred a suit by state hospital employees for overtime compensation under the Fair Labor Standards Act, the Court made clear that the mere entry into a field of congressional regulation alone will not constitute a waiver of immunity, subjecting the State to federal suits by private individuals. 377 U.S. at 186, 84 S.Ct. 1207; 411 U.S. at 280–281 n.1, 285, 93 S.Ct. 1614. "Congress must ex-

Missouri v. Department of Public Health and Welfare of Missouri, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973). It is also clear that, although the Amendment speaks only of suits "in law or equity," the immunity extends to suits in admiralty. Ex parte New York, 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057-(1921).

4. Relying on the rationale of *Parden,* lower federal courts have similarly held that by operating as a common carrier in interstate commerce on navigable waters, a State waives its immunity to suits under the Jones Act. Cocherl v. State of Alaska, 246 F. Supp. 328 (D.Alas.1965); Huckins v. Board of Regents of University of Michigan, 263 F.Supp. 622 (E.D.Mich.1967); Rivet v. East Point Marine Corp., 325 F.Supp. 1265 (S.D. Ala.1971). In *Cocherl* and *Huckins,* however, the courts held that the claims asserted under the general maritime law were barred by the Eleventh Amendment.

press an intent to override the State's immunity." Red Star Towing and Transportation Co. v. Department of Transportation of State of New Jersey, 423 F.2d 104, 106 (3rd Cir. 1970); Daye v. Commonwealth of Pennsylvania, 483 F.2d 294, 298 (3rd Cir. 1973). In *Parden,* the Supreme Court found such an intent in the creation by Congress in the Federal Employers' Liability Act of a cause of action against "every" inter-state rail carrier, which the Court con-cluded embraced state-owned as well as privately-owned railroads. 377 U.S. at 187–190, 84 S.Ct. 1207. In *Employees,* the Court could find in the Fair Labor Standards Act no "clear language" indi-cating a congressional purpose to de-prive a State of its constitutional immu-nity from federal suits under that Act. 411 U.S. at 285, 93 S.Ct. 1614.

■ In the present case, a careful ex-amination of the various provisions of the Water Quality Improvement Act dis-closes not a word to indicate any intent by Congress to permit individuals to sue a State in the federal courts for activi-ties in the cleanup of oil spills. Unlike the Federal Employers' Liability Act, the Water Quality Improvement Act cre-ates no private rights of action; only the United States is authorized to sue to enforce the Act's essentially penal sanc-tions. *See, e. g.,* 33 U.S.C. § 1160(f)(4) and (k)(3) (prosecutions to recover for-feitures); § 1160(g) (suits to abate pol-lution); § 1161(b)(4) (prosecutions for failure to report illegal discharges). Furthermore, to infer that in enacting the Water Quality Improvement Act Congress deprived the States of their constitutional immunity from private suits arising from cleanup activities would frustrate the Act's repeatedly ar-ticulated objective of encouraging State

participation and cooperation in the cleanup of oil spills. *See* 33 U.S.C. §§ 1151(c), 1154, 1160(b), 1161(o)(2). In the absence of a clear indication of a purpose of Congress to subject the States to private actions in the federal courts, there is no basis for concluding that Congress intended to deprive the States of their constitutional immunity from such suits. *Cf.* Red Star Towing and Transportation Co. v. Department of Transportation of State of New Jersey, *supra* (no waiver of Eleventh Amend-ment immunity by constructing and op-erating a bridge over a navigable water-way); Daye v. Commonwealth of Penn-sylvania, *supra* (no waiver of immunity by acceptance of funds under the Feder-al-Aid Highway Act); Citizens Commit-tee for Hudson Valley v. Volpe, 297 F. Supp. 809 (S.D.N.Y.1969) (no waiver of immunity by constructing an expressway over a navigable waterway).[5]

■ TAMANO's second theory of waiver by the State of its Eleventh Amendment immunity relates only to the counterclaim in Civil 13–114. TA-MANO argues that by bringing suit against it in this Court, the State waived its immunity and "voluntarily submitted" to the Court's jurisdiction of any counterclaim that might be asserted against it. This proposition is, of course, correct when the counterclaim arises from the same event which is the subject of the State's action. Gunter v. American Coastline R.R. Co., 200 U.S. 273, 284, 26 S.Ct. 252, 50 L.Ed. 477 (1906); Clark v. Barnard, 108 U.S. 436, 447–448, 2 S.Ct. 878, 27 L.Ed. 780 (1883); Department of Transportation of State of Illinois v. American Commer-cial Lines, Inc., 350 F.Supp. 835, 837–838 (N.D.Ill.1972); State of Alaska v. O/S Kendall, 310 F.Supp. 433 (D.Alas.

5. Plaintiffs place great reliance on Chesa-peake Bay Bridge and Tunnel District v. Lauritzen, 404 F.2d 1001 (4th Cir. 1968), in which the court held that the Eleventh Amendment did not bar a suit by a foreign shipowner against a state bridge and tunnel district to recover hull damage suffered when a ship struck a submerged light tower. Relying on and citing *Parden,* the court concluded that the State waived its consti-tutional immunity by entering "an exclusive Federal realm—interstate and foreign com-merce." 404 F.2d at 1003–1004. As pre-viously stated, however, *Employees* makes clear that the mere entry of a State into a congressionally regulated sphere, without more, will not constitute a waiver of im-munity.

1970); 3 Moore's Federal Practice ¶ 13.19[2] at 489–91 (1973 Supp. at 12); *cf.* United States v. United States Fidelity and Guaranty Co., 309 U.S. 506, 511, 60 S.Ct. 653, 84 L.Ed. 894 (1940).[6] But, in the present case, the claims asserted by TAMANO in its counterclaim are unrelated to those asserted by the State in its action. The damages sought by the State are confined to those allegedly resulting from the oil spill, whereas the damages sought by TAMANO relate solely to those claimed to have been caused by the State's subsequent cleanup activities. In the view of this Court, it cannot be said that Tamano's counterclaim arises from the same event which is the subject of the State's action. This Court is therefore without jurisdiction to entertain the counterclaim in the absence of the State's consent thereto. In re Monongahela Rye Liquors, Inc., *supra* n.6; State of Alaska v. O/S Kendall, *supra*; 3 Moore's Federal Practice, *supra*, ¶ 13.19 [2] at 490; *cf.* In re Northern Transatlantic Carriers Corp., 423 F.2d 139, 141 (1st Cir. 1970).

## II.

### *Failure to State a Claim Upon Which Relief Can be Granted*

Analysis of the claims asserted by TAMANO against the State in the counterclaim and third-party complaints conclusively demonstrates that no claim is stated upon which relief can be granted.[7] The claims TAMANO asserts against the State, both on its own behalf and on behalf of the various class action plaintiffs, are stated in identical counts in the counterclaim and third-party complaints. They fall into three categories: (1) Counts I and II allege failure to comply with the State Oil Contingency Plan [8] by having in effect the means to implement the Plan, including adequate sites for the disposal of debris; (2) Count III alleges refusal to approve disposal sites found by TAMANO; and (3) Count IV alleges refusal to reopen clam flats previously closed because of oil pollution.

■ 1. *Counts I and II.* The claims asserted in Counts I and II are bottomed upon the State Oil Contingency Plan promulgated pursuant to the Maine Oil Discharge Prevention and Pollution Control Act. TAMANO concedes, as it must, that neither the Act nor the Plan imposed any duty on the State, either to clean up the oil spill or to provide sites for the disposal of debris accumulated in the cleanup. TAMANO's argument is that by adopting the Oil Contingency Plan, the State made certain representations as to the availability of cleanup facilities, including disposal sites; that TAMANO was entitled to and did rely upon these representations; that the facilities were not in fact available; and that hence the State is liable for any additional cleanup costs and damages incurred by TAMANO under the principle of Indian Towing Co., Inc. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) and Rayonier, Inc. v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957) that "government must not mislead, and must not induce reliance upon a belief that it is providing something which, in fact, it is not providing." United States v. Sandra & Dennis Fishing Corp., 372 F.2d

6. The waiver is, however, limited to a counterclaim asserted defensively, by way of recoupment, for the purpose of defeating or diminishing the State's recovery, but not for the purpose of obtaining an affirmative judgment against the State. 3 Moore's Federal Practice, *supra*, ¶ 13.19[2] at 490; In re Monongahela Rye Liquors, Inc., 141 F.2d 864, 869 (3rd Cir. 1944); Fort Fetterman v. South Carolina State Highway Department, 261 F.2d 563, 569 (4th Cir. 1958); Department of Transportation of State of Illinois v. American Commercial Lines, Inc., *supra*; State of Alaska v. O/S Kendall, *supra*; *cf.* United States v. United States Fidelity and Guaranty Co., *supra*.

7. Despite the Court's determination that the Eleventh Amendment bars TAMANO's counterclaim and third-party claims against the State, the Court will rule upon the State's alternative contention that no actionable claim is presented, a question which counsel have fully briefed and argued.

8. By agreement of counsel, a copy of the State Oil Contingency Plan has been incorporated in the record for purposes of the present motions.

189, 195 (1st Cir.). cert. denied, 389 U. S. 836, 88 S.Ct. 52, 19 L.Ed.2d 98 (1967). TAMANO's reliance upon the Oil Contingency Plan is, however, wholly misplaced. An examination of the Plan discloses that it is no more than "a ready reference of equipment and material available with which to combat spills" compiled to assert oil and shipping interests in discharging the responsibility for the cleanup of oil spills imposed upon them by the Oil Discharge Prevention and Pollution Control Act. *See* 38 M.R.S.A. § 548. The Plan contains no undertaking by the State to provide the facilities listed therein, nor does it include any assurance by the State as to the availability of such facilities. Absent a representation upon which TAMANO might reasonably have relied, *Indian Towing* principles are inapplicable.[9]

■ 2. *Count III*. The claim asserted in Count III is grounded upon the alleged arbitrary refusal of the State to approve disposal sites found by TAMANO. TAMANO does not, however, point to any statute or other source granting the State the authority, or imposing upon it the duty, to approve such sites. Absent a duty, or even the power, to act, it is hornbook tort law that no liability can result from a failure to act.

■ 3. *Count IV*. Count IV appears to allege that the State intentionally and in bad faith closed and refused to open certain clam flats in order to strengthen the State's damage action against TAMANO. It is asserted that this unwarranted action increased TAMANO's cleanup costs and its potential liability to third persons arising from the spill. It is too obvious to warrant discussion that neither the State nor third persons can recover any damages of TAMANO other than those for which

TAMANO was responsible and that damages so recoverable cannot include any which may have resulted from the closing of clam flats for any reason other than oil pollution caused by the spill.[10]

### III.

· The State's motions to dismiss the counterclaim asserted by TAMANO against the State in Civil No. 13–114 and the third-party complaints filed by TAMANO against the State in Civil Nos. 13–111, 13–115 and 13–120 are granted, and said counterclaim and third-party complaints are dismissed.

It is so ordered.

---

9. Nowhere does TAMANO allege that the State undertook responsibility for the cleanup operation, so that it might be liable on *Indian Towing* principles for negligence in the discharge of an assumed responsibility.

10. The State also points out that the pertinent statute, 12 M.R.S.A. § 3503, upon which TAMANO relies, authorizes the Commissioner of Sea and Shore Fisheries unilaterally and without hearing to close clam flats whenever examination reveals that they are contaminated. No possible construction of this statute suggests that it creates any duty on the part of the State toward TAMANO and others similarly situated.