**DEPARTMENT OF EDUCATION, STATE OF HAWAII, Plaintiff,**

**v.**

**KATHERINE D., a minor by and through her natural parents and legal guardians, Kevin and Roberta D., Defendants, Counter-claimants,**

**and**

**Department of Education, State of Hawaii, Counterclaim-Defendant.**

**Civ. No. 80–0582.**

United States District Court, D. Hawaii.

Jan. 28, 1982.

---

Charleen M. Aina, and Russell Kato, Deputy Attys. Gen., Honolulu, Hawaii, for plaintiff.

Karen D'Agusto, Protection and Advocacy Agency, Inc. Honolulu, Hawaii, Stanley E. Levin, Paul D. Alston, Honolulu, Hawaii, for defendants, counter-claimants.

## DECISION

CLAIBORNE, Chief Judge.

This is an action by the Department of Education of the State of Hawaii for judicial review of an administrative hearing officer's decision rendered pursuant to Section 615 of the Education for All Handicapped Children Act of 1975 (hereinafter "EAHCA"), 20 U.S.C. § 1415. The jurisdiction of this Court is invoked under 20 U.S.C. § 1415(e)(2) and 45 C.F.R. § 121a.511. Jurisdiction of this Court over the action as initially brought by the Plaintiff DOE is not disputed.

The Defendants have brought a counterclaim against the DOE. They allege that this Court has jurisdiction over the counterclaim under 28 U.S.C. §§ 1331 and 1343, and 20 U.S.C. § 1415(e). Jurisdiction as to the counterclaim is disputed.

The standard of review by the District Court in a P.L. 91–142 (20 U.S.C. § 1415(e)(2)) case, is as follows: "the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." It therefore appears the Court has authority to formulate the relief it deems appropriate.

Katherine D. is a four-year-old handicapped child who has been found eligible for special education services under the Education for All Handicapped Children Act (20 U.S.C. § 1401 et seq.). Her identified handicapping condition is that she is "other health impaired," as defined in 45 C.F.R. § 121a.5. She suffers from cystic fibrosis. In late January, 1981, it was determined, by a diagnostic examination, that Katherine D. has tracheomalacia which means that the walls of her windpipe are floppy and not rigid.

Since 1978, Katherine has had a tracheostomy and worn a tracheotomy tube. Until February, 1981, the tracheotomy tube was held in place by surgical strings which were threaded through a plastic tube which she

wore around her neck as a collar necklace. Since that time, the tracheotomy tube has been held in the tracheostomy by means of a 14 karat gold chain approximately ¼ to ½ inch in diameter. The tracheostomy and tracheotomy tube allow Katherine to breathe and expel secretion from her lungs.

Since Katherine has had her tracheostomy, there have been four instances in which Katherine's tracheotomy tube either was dislodged or was in danger of being dislodged. In 1978, her tracheotomy tube had to be inserted in two other instances while Katherine was hospitalized at Kapiolani-Children's Hospital. In one instance which occurred in 1978 while Dr. Arlene Meyers, her then attending physician was trying to change the size of Katherine's tracheotomy tube, Dr. Meyers encountered difficulties reinserting the tube, and Katherine was within a couple of minutes of dying. Present in the room were Katherine's parents, a respiratory therapist, a pulmonary fellow, a nurse, and Dr. Meyers. The room in which the procedure took place contained all the equipment needed for the procedure.

Katherine is unable to vocalize normally, due to two conditions. First, her windpipe is not rigid enough to maintain its diameter and allow sufficient air to pass from her lungs through her vocal chords. The condition of her windpipe is attributable to tracheomalacia. Second, because the tracheostomy is located below her vocal chords, most of the air exhaled from the lungs leaves through the tracheostomy before it passes her vocal chords. Since February, 1981, however, Katherine has been able to speak audibly, although very softly. This would indicate that more air is capable of passing through the length of her windpipe more readily than before.

The cystic fibrosis causes thick mucus to accumulate in her lungs and makes her susceptible to recurrent pulmonary infections. Because Katherine is not always able to cough this mucus out herself, it is necessary for it to be suctioned out two or three times a day, through her tracheotomy tube. The cystic fibrosis also causes her to be unable to absorb food normally because she lacks the necessary pancreatic enzymes as a result of that disorder. To facilitate food absorption and to ensure proper nutrition, Katherine must have a special diet, and take pancreatic enzymes and vitamins before every meal.

The only condition adversely affecting Katherine's educational performance is her speech difficulty. During the school year 1980–81, but for the potential danger to Katherine in the event that her tracheotomy tube was dislodged, Katherine could have been educated in a regular classroom and received itinerant speech therapy.

During the school year 1980–81, Katherine attended St. Philomena's Child Care Center, a parochial child care facility and kindergarten operated under the auspices of St. Philomena's Catholic Church, and licensed by the Department of Social Services and Housing and the DOE, respectively. She received the same preschool program as is offered to all children attending her class. She received charitable speech therapy at home through the California-Hawaii Elks Major Project since December, 1979. She continues to receive this speech therapy presently. During the 1980–81 academic year, Katherine D. did well, academically and socially, at St. Philomena's.

Katherine began attending St. Philomena's as a student in the summer of 1979. Roberta D., Katherine's mother, is employed as a teacher at St. Philomena's; her employment has been concurrent with Katherine's attendance. While Katherine is in attendance at St. Philomena's, her mother administers her medication and does any suctioning which might be necessary during the school day. No person other than her mother is responsible to reinsert Katherine's tracheotomy tube should it become dislodged while she is at school. Katherine D. qualifies for enrollment in St. Philomena's kindergarten class for the school year 1981–82, but that enrollment is contingent upon her mother remaining on the school's staff.

Katherine's tuition at St. Philomena's for the school year 1980–81 amounted to $1,200 or $120 per month during the academic

year. In addition, Katherine's family incurred miscellaneous school expenses (for books and registration and related matters) of $135. For 1981–82, the tuition is $650 and the related costs are estimated at $130. Katherine's parents wish to have Katherine educated in a regular education class in a public school, with itinerant special education speech and language services provided as well. They will, however, only allow Katherine to attend public school if a trained person or persons is available at school to respond to her health needs, i.e., to suction excess mucus from her lungs, if necessary; to administer medication before she eats lunch; and to reinsert her tracheotomy tube should it become dislodged. An air-conditioned vehicle is not necessary for transporting Katherine to and from school.

In the opinion of Katherine D.'s treating physicians, the emergency care available to Katherine from her mother while both of them are at St. Philomena's was and is adequate for Katherine's safety. When Katherine is at St. Philomena's, her mother is on the campus, usually in another classroom. They are within two minutes apart throughout the school day. The training that Mrs. D. has had to enable her to handle Katherine's medical emergencies was provided to her by the staff at Kapiolani-Children's Hospital, while Katherine D. was a patient there recovering from her tracheotomy operation.

In order for Katherine to develop her speech and vocabulary normally, she needs to socialize with other children. Isolation in a homebound program of instruction would hamper Katherine's social and educational development. Participation in a school program helps Katherine to benefit from her speech therapy. On May 13, 1980, Mr. and Mrs. Dorr requested a comprehensive evaluation for Katherine to determine if she was eligible for educational programs in public schools. At that time, Mrs. Dorr explained to the Department of Education that Katherine had a tracheostomy and requires someone who is trained to replace the tube should it become dislodged at all times.

In the summer of 1980, the DOE conducted a comprehensive evaluation on Katherine. This evaluation was required by the Education for All Handicapped Children's Act, 20 U.S.C. § 1412(5)(C). In August, 1980, the DOE agreed that Katherine was entitled to special education and related services. Shortly thereafter, the DOE offered an individualized educational program (hereinafter "IEP") to Katherine. Initially, the DOE offered an educational placement at Jefferson Orthopedic School, but subsequently withdrew the offer. The DOE then offered Katherine a homebound program consisting of 1½ (one and one-half) hours of speech therapy and 40 (forty) minutes of parent counseling per week.

The DOE's initial offer for placement at Jefferson Orthopedic School was withdrawn on the basis of a recommendation made to the DOE by Allan Oglesby, M.D., then the Administrator of the Family Health Division, Department of Education, State of Hawaii, and responsible for the School Health Program Branch which provides health services for the DOE's regular and special education programs. In his opinion, the facilities, procedures and personnel available in any of the public schools could not provide the kind of emergency care Katherine D. would require should her tracheotomy tube become dislodged while she was in attendance. To assure Katherine D.'s safety, Dr. Oglesby recommended that Katherine D. not be placed in public school. It was then his opinion, formulated from information provided him, that Katherine D. required an educational setting which included personnel, equipment, and medical expertise of the kind available in a hospital emergency care facility. In his opinion, the DOE was not capable of emulating such a setting. Dr. Oglesby has never examined Katherine but did see her at the October, 1980 administrative hearing.

At the time he testified in the administrative proceedings, Dr. Oglesby thought that Katherine was in a life-threatening situation whenever she was outside the hospital. Based upon what he presently knows of Katherine's condition, Dr. Oglesby believes that the program planned by the

DOE for 1981–82 at Moanalua School is reasonable, safe, and proper.

In recommending against placement in the public schools, Dr. Oglesby did not consider the suitability of placement at St. Philomena's. Dr. Oglesby's recommendation was based upon his review and understanding of Katherine D.'s medical records and information provided him by Arlene Meyers, M.D., who at the time was Katherine D.'s attending physician at Kapiolani-Children's Pediatric Pulmonary Clinic.

At the time he made his recommendation, Dr. Oglesby was not aware that Katherine D.'s tube had been dislodged while she was at home, or that her parents were able to reinsert the tube without any adverse effects to her. In making his recommendation to the DOE, Dr. Oglesby did not consider whether Katherine could attend St. Philomena's. He thought private school placement was unrelated to his responsibility, as head of the School Health Services Program, to assure her safety in a public school. In Dr. Oglesby's opinion, Kevin and Roberta D., as parents, were free to evaluate the situation at St. Philomena's for themselves and make a determination that Mrs. Dorr's presence there was sufficient to assure them of Katherine's safety.

The Educational Placement section of the DOE's Program Standards and Guidelines for Special Education and Special Services, Programs and Services for the Orthopedically Handicapped and Other Health Impaired provides in part, that students eligible for homebound instruction are those

> . . . who are required to spend an extended period of time (twenty days or more) at home or in a hospital setting due to a physical impairment or illness. . . . The student is expected to be under medical care and should be certified as eligible for consideration for this program by a licensed physician. . . .

> . . . . .

> Hospitalized and homebound care should be considered to be among the least advantageous educational arrangements, to be utilized only when a more normalized process of education is unsuitable for a student who has severe health restrictions.

The Educational Placement section also provides the following with respect to nonpublic school services:

> *Nonpublic School Services.* Consideration should be given to nonpublic school placements only when adequate educational facilities or programs are not yet available in the public educational system. Advantages which may accrue to the student placed in such a setting are the availability of medical care, provisions for special treatment (such as swimming pools and recreational programs) programs for children of prior-to-school age or the location of such a facility which would enable a student to reside in his or her own home. The utilization of any nonpublic services should be continually evaluated to ascertain whether or not the student placement should be reconsidered.

The Eligibility section of the DOE's Home-Hospital Instruction Guide provides in part:

> A child is eligible for home-hospital instruction if medical evidence shows that the child is physically unable to attend regular school. Eligibility is determined on the basis of a medical report from the attending physician that such is the case. . . .

The Referral section of the DOE's Home-Hospital Instruction Guide provides in part:

> Referrals for service may come from any one of various services, with most of the applications made by schools. Other sources include private physicians, hospitals, social work agencies, and mental health clinics.

> All applications must be accompanied by a medical form or letter signed by the attending physician recommending home-hospital instruction. A new medical certification statement and recommendations are necessary at the beginning of the new school year even for the child who has been in the program the preceding year.

Health Services in the public schools are provided by the Department of Health. Such services include first aid and emergency care, preventive health care, health appraisals and follow-ups, and health room facilities. The services which, under Hawaii law, can only be performed by a licensed nurse are provided by school health complex nurses. All other health services are performed by school health aides. Except in two instances wherein a school health nurse is permanently assigned to one school, a school health nurse circulates within a school health complex consisting of six to ten schools in a particular geographical area. At least one school health aide is assigned to each school.

a) The school health nurses presently employed by the Department of Health are licensed registered nurses. Most of them are public health nurses who have a particular interest in working in the school setting.

b) Each school health aide is required to have a current First Aid Certificate. Although 50 percent of the school health aides have voluntarily taken Cardio Pulmonary Resuscitation ("CPR") courses, it is not a prerequisite for the position. The majority of the school health aides are young mothers who have taken the job because the work schedule corresponds to that of their children's school schedule.

c) School health aides are expected to administer necessary first aid care for minor injuries or illnesses which students receive or experience while attending school in accordance with the Health Room First Aid Chart, and to administer medication to the extent allowed.

d) An emergency card for each student in attendance at school is on file in the school's health room. The cards of students with ailments or health conditions which are known to require a particular response, specify the appropriate kind of care and action which is to be taken in an emergency.

Shortly after the DOE's offer was made, Kevin and Roberta D. rejected it and initiated a due process administrative hearing, pursuant to DOE Rule 49.

The administrative hearing was conducted on October 2, and 6, 1980 by a hearing officer. The hearing officer ruled in the parents' favor, holding that the DOE failed to provide Katherine with a free appropriate public education when it offered to provide home instruction during the school year 1980–81.

The decision rendered by the administrative hearing officer requires the DOE to pay Katherine's tuition at St. Philomena's Child Care Center for the school year 1980–81. The hearing officer found that the DOE's officer of home instruction, was not a "free appropriate public education" in the "least restrictive environment." The hearing officer further found that the non-availability of a public preschool program capable of responding to Katherine's health needs did not absolve the DOE of its responsibility to provide her with a preschool program under the EAHCA.

At an IEP conference held September 1, 1981, the DOE offered Kevin and Roberta D. a non-special education kindergarten program with itinerant speech therapy to be provided during the school day for two hours each week for Katherine during the 1981–1982 school year. Placement is to be in a regular kindergarten classroom at Moanalua Elementary School, Katherine's home school.

At that conference, the DOE generally outlined emergency procedures which would be used to respond to any accidental dislodging of Katherine's tracheotomy tube during her attendance at Moanalua, as well as to provide any suctioning which might be necessary during the school day. Provisions which would be made to assure that Katherine received her medication were also described. The nature of the transportation services which would be included as a related service in Katherine's IEP were also related at the conference. Details as to the emergency procedures are yet to be worked out with Tripler Medical Center or another appropriate emergency medical care facility.

Kevin D. indicated that they would provide for Katherine's transportation to and from school. He also indicated that Katherine would not require regular suctioning during the school day.

At the close of that IEP conference, Kevin D. requested that he be able to confer with Roberta D. about the program and placement which the DOE offered. The IEP has not yet been returned to Moanalua Elementary School. Kevin and Roberta D. have, however, indicated their continued interest in having Katherine enter Moanalua Elementary School no later than January, 1982.

On September 9, 1981, school personnel who could reasonably be expected to be in the vicinity of Katherine during the school day and other interested school personnel, attended the first of two training sessions organized by the DOE to acquaint them with Katherine's disability and instruct them in how to appropriately respond to any accidental dislodgment of her tracheotomy tube. The session was conducted by Dr. Michael Light, Katherine's present treating physician.

Accordingly to Dr. Light's testimony, he found the teachers and school administrators less than enthusiastic about the plan. In fact, there were expressions of displeasure with the plan and the general atmosphere was one of uncooperativeness. Indeed, the adverse sentiment toward this plan surfaced a few days later by the filing of a grievance by the administrators of the school and three teachers on behalf of the Classroom Teachers Association charging violation of their contracts of employment by being required to perform duties of a medical nature outside the scope of their contractual duties. These grievance petitions are now subject to arbitration and undecided.

At first glance, it may appear that the attitude of the school personnel was one of callousness and "lack of feeling" but when you explore the circumstances, it becomes clear that they responded to the plan with fear and trepidation. Fear that they could not perform the medical procedure correctly and that the child might die at their hands; or fear of the personal aspects of the procedure itself; and/or the fear of being sued if something untoward occurred during the procedure. These are genuine and legitimate fears and understandably so. Therefore, I cannot fault the school personnel for objecting to being asked to perform such medical procedures.

In any event, the attitude of the school's personnel toward the plan made it completely unworkable and ineffectual. A plan ceases to be a plan when it becomes ineffectual. Put in another way, the plan self-destructed with the filing of the grievance by the school administrators and teachers involved.

Plaintiffs argue to the contrary by stating to this Court that they believe it will win the arbitration fight. I believe they are overly optimistic. It seems common sense would dictate they cannot force duties upon an employee beyond those designated in their contract, especially if they are duties of a medical or quasi-medical nature. Nevertheless, I must consider the facts as they now exist, not what they might be with the happening of prospective occurrences.

Now, to bring the issues into sharp focus, was the decision of the impartial administrative hearing officer regarding the DOE to pay Katherine D.'s tuition at St. Philomena's Child Care Center for the school year 1980–1981 correct?

The DOE contended at the hearing, and they now contend here, that DOE's responsibilities under the law were fully met when it offered Katherine D. and her parents a program consisting of one and one-half (1½) hours of speech therapy and forty (40) minutes of parent counseling in a home environment for the school year 1980–1981.

The DOE further contended, as they now contend, that the parents of Katherine D. voluntarily placed their child in a private pre-school after a free public education had been offered and thusly the parents should be financially responsible for her tuition payments there.

The impartial hearing officer rejected these contentions and I also reject them here. The State plan for the education of pre-school handicapped children of July, 1980, states:

By September, 1980, the Department will provide a free appropriate public education for pre-school handicapped children ages 3 and 4 years. (Rule 49, DOE Rules)

DOE must provide as follows:

If State law or a court order requires the State to provide education for handicapped children in any disability category in any of these age groups, the State must make free appropriate public education available to all handicapped children of the same age who have that disability. (P.L.–142, 20 U.S.C., Sec. 1401)

The State of Hawaii has therefore declared its intent to educate this age group no later than September, 1980. That intention was not so implemented in that even as of this date it does not have public pre-schools available.

The parents of Katherine D., pursuant to State law, and well within the scope of DOE's announced intent, requested an appropriate program for her. The evidence at the administrative hearing shows that the Central School District recognized their responsibility under the law and at least made some efforts to arrange for Katherine's admission into the Jefferson School program. This was unsuccessful and then the DOE announced the home instruction program.

Apparently, since the law's intent had not been met and no school was available, DOE felt that to offer a home instruction program was the best they could do under the circumstances. Eventually they sweetened the offer with an offer of an IEP speech program. A speech program is necessary but the one suggested was not current to Katherine's needs.

Federal regulations promulgated to implement the EAHCA with respect to the concept of where such a child should receive its education, prescribes as follows:

... to the maximum extent appropriate, handicapped children, including in public or private institutions or other care facilities, are educated *with children who are not handicapped* and that special classes, separate schooling or other removal of handicapped children from the regular educational environment occurs only when the nature of severity of the handicap is such that education in regular classes with the use of supplemental aids and services cannot be achieved satisfactorily. (45 C.F.R. Sec. 121a.550(b)).

And:

Unless a handicapped child's individualized education program requires some other arrangement, the child is educated in the school which he or she would attend if not handicapped; and *in selecting the least restrictive environment*, consideration is given to any potential harmful effect on the child or on the quality of services which he or she needs. (45 C.F.R. See 121a.552(c) and (d)).

And further:

Each State educational agency shall carry out activities to insure that teachers and administrators in all public agencies are provided with technical assistance and training necessary to assist them in implementing the requirement that *the handicapped child is educated in the least restrictive environment*. (45 C.F.R. Sec. 121a.555).

Clearly, the home treatment program offered by the DOE in this case does not satisfy the concept of the "least restrictive environment" prescribed by the federal regulations.

EAHCA requires the DOE to provide "special education" and "related services" to all "handicapped children." There is no dispute that Katherine D. is handicapped within the meaning of the EAHCA (20 U.S. § 1401; 45 C.F.R. § 121a.54). Nor is there any question that she is entitled to special education in the form of speech therapy (20 U.S.C. § 1401(16); 45 C.F.R. § 121a.14). Rather, the question is (1) whether Katherine D. is entitled to have the DOE access to someone who can assist her in the event that her tracheostomy is dislodged, and, if not, (2) whether the DOE must pay for a

private school placement when such assistance is available at no cost at a private school and Katherine D. can then avoid the confining and adverse impact of a home tutoring program.

As to the first question, the answer is that if the assistance she needs falls within the EAHCA definition of "related services" (20 U.S.C. § 1401(17); 45 C.F.R. § 121a.13), then it must be provided to her. The answer to the second question turns upon the DOE's duty to see that all handicapped children are educated in the least restrictive environment appropriate for them. Katherine D. contends it is her private preschool where she has gone since 1979. The DOE contends it is her home.

The types of EAHCA-mandated related services which are involved here include those "supportive services"—specifically including school health services—required to assist Katherine D. to benefit from her program of special education. The state is required to educate Katherine D., to the maximum extent appropriate, with other children who are not handicapped. (45 C.F.R. § 121a.550(b)(1)). Further,

> [placement in] special classes, separate schooling or other removal from the regular educational environment [is permitted to occur] *only* when the nature and severity of the handicap is such that education in regular classes with supplementary aids and services cannot be achieved satisfactorily. (45 C.F.R. § 121a.550(b)(2)). (emphasis added)

Katherine D.'s contention, with which I agree, is that with appropriate supportive services in the form of trained persons to whom Katherine D. has immediate access (while going to and from school and at school) who can help her with the tracheostomy in the event of an emergency, she can attend a school instead of being confined to home instruction.

The evidence shows that this service can be provided by a nurse or other trained person who need not be a physician. There was no evidence to the contrary. Therefore, this help is within the definition of related services (e.g., because it is a school

health service) or is, in any event, not the type of medical assistance which is excluded from the definition of "related services."

The evidence shows (1) that but for the possibility of physically harmful problems with her tracheostomy Katherine D. should be in regular school; (2) that the aid Katherine D. needs can be—and for some years has been—provided by trained lay people; (3) that the necessary skills can be learned at no cost in a matter of hours; and (4) that if a trained person is at hand, Katherine can attend school—as she did last year and the year before—without any serious risk to her well-being. On these bases, Katherine D. is entitled to transportation and a school-based education with special attendants at DOE expense. *Tatro v. State of Texas*, 625 F.2d 557 (5th Cir. 1980).

The evidence is that replacing the tracheostomy tube is simple to learn and not complicated. In an emergency, Katherine D. may need help during school. She must, in any event, always be assured that qualified help is close at hand; but if help is there, she can go to school. At St. Philomena's School, this help was always available.

Katherine D. is entitled to have the DOE pay her tuition at St. Philomena's School. The evidence shows that Katherine D. can attend that school because her mother is there and can give this supplementary aid—even if it is not a related service under the EAHCA—at no expense to the DOE. This being so, placement at St. Philomena's, together with DOE—provided itinerant speech therapy is the least restrictive environment appropriate for Katherine. Anything more restrictive is unnecessary given the unique opportunity available at St. Philomena's.

Arguments that because 45 C.F.R. § 121a.552(d) requires that "consideration is given to any potential harmful effect on the child" in selecting the least restrictive alternative, Katherine D. must be confined to her home is not persuasive. Katherine's mother has to work to help support the family and thus she cannot always be home to attend to Katherine. Second, at home, Katherine D. will get no better attention

than she has at St. Philomena's and she will lose the valuable educational benefit of a structured preschool program and contact with other young children in that setting. Finally, home tutoring provides none of the nonacademic related services—mandated by the EAHCA—which all young children need for healthy intellectual and emotional growth. In any event, all of the DOE's concerns about Katherine D.'s safety can be met with better service and that is just what the EAHCA requires. Once the quality of the health services provided at school (be it a DOE facility or St. Philomena's) equal that to be found at home, Katherine is entitled to go to school.

The focus of Section 504 is slightly different from that of the EAHCA. The EAHCA enumerates certain specific handicapping conditions and requires that students with those conditions receive free appropriate public educations which (1) meet the state educational standards and (2) are individually planned in the manner required by the regulations (45 C.F.R. § 121a.340–49). No specific mention is made of a requirement that the services be comparable to those provided to nonhandicapped children.

The Rehabilitation Act and its implementing regulations prohibits discrimination by agencies which receive federal aid against anyone with "a physical or mental impairment" that substantially limits "one or more major life activities" (45 C.F.R. § 84.2(j)). The law specifically and unequivocally requires that educational agencies provide free education and

> related aids or services that are . . . designed to meet the individual educational need of handicapped persons as adequately as the needs of non-handicapped persons are met . . . (45 C.F.R. § 84.-33(b)(i)).

Further, the DOE is specifically required to:

> educate or . . . *provide* [at its own expense] *for the education* of each qualified handicapped person in its jurisdiction with persons who are not handicapped to the maximum extent appropriate to the

needs of the handicapped person. 45 C.F.R. § 84.34(a) (emphasis added)

In addition, the DOE:

> *shall* place a handicapped person in the regular educational environment operated by the recipient *unless it is demonstrated by the recipient* that the education of the person in the regular environment with supplementary aids and services cannot be achieved satisfactorily. (45 C.F.R. § 84.34(a)) (emphasis added).

The DOE must offer a free and appropriate education *that meets these mainstreaming requirements*, and if the parents of the handicapped child still choose to place the person in a private school, then the DOE is excused from having to pay for education in the private school. (45 C.F.R. § 84.33(c)(4)). Conversely, then, if those requirements are not met, the placement is at DOE expense.

DOE has not demonstrated that Katherine D. cannot be satisfactorily mainstreamed with the use of supplementary aids and services. Then Katherine D. is entitled either to education and services in a DOE facility or to tuition and services at St. Philomena's School. There is no question that Katherine D. needs to have quick access to a trained person who can help her in the event of an emergency problem with her tracheostomy. She also needs periodic access to a trained person who can administer her medication and use specialized equipment to suction excess mucus from her system. The latter services do not present any problem; a nurse will provide that care as and when Katherine needs it.

The former is a problem. The DOE contends that because of the uncertainty as to whether the present school health staff (a) is competent and (b) would always be available, Katherine D. is not entitled to attend school. Instead, she is entitled only to a few minutes of speech therapy at home each week. This position is untenable.

Under § 504, the DOE is not required to provide services to Katherine if her handicap will prevent her from ever realizing the principal benefits of the educational program. *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60

L.Ed.2d 980 (1979). However, if the service will enable Katherine to attend and to participate meaningfully, then it must be provided regardless of its uniqueness. *Camenisch v. University of Texas*, 616 F.2d 127 (5th Cir. 1980), *cert. granted*, 449 U.S. 950, 101 S.Ct. 352, 66 L.Ed.2d 213 (1980).

Katherine D. needs service from someone in the event her tracheostomy is dislodged. With that service, she can attend school and perform well. The individualized attention Katherine needs is functionally no different from the personalized attention afforded in *Camenisch* or *Tatro, supra.*

The DOE argues that the burden of providing this service to Katherine is more than it can be required to bear under § 504. As explained in *Tatro*, the Supreme Court in *Davis, supra,*

> § 504 does not require the provision of services that would impose "undue financial and administration burdens upon the recipient . . . 99 S.Ct. at 2370." Thus, for example, § 504 *may* not require the school district to provide a very expensive procedure like kidney dialysis during the school day. 625 F.2d 557, 564, 565 n. 19.

If *Davis* is correct, the DOE is still not excused from doing more than giving Katherine some home-based speech therapy. Under § 84.34, the range of alternatives considered by the DOE must include private school placement. In this case, there is such a placement where the supplementary services can be provided at no cost beyond the basic tuition expense of $1,200 per year.

There remains only one other question in this case and that is whether this Court may award tuition reimbursement and attorney's fees and costs in this case.

■ The EAHCA (20 U.S.C. § 1415(e)(2)) provides that this Court, based upon a preponderance of the evidence, is to "grant such relief as the Court determines is appropriate." This may include a claim for damages. *Boxall v. Sequoia Union High Sch. Dist.*, 464 F.Supp. 1104 (N.D.Cal.1979).

■ Section 504 of The Rehabilitation Act (29 U.S.C. § 794) likewise provides a private cause of action to redress or prevent discrimination in federally assisted programs. See, e.g., *Won v. Clark*, Civ. No. 79–0570, Memorandum Decision (D.Haw. 11/10/80); *Boxall v. Sequoia Union High Sch. Dist., supra*, and *Patton v. Dumpson*, 498 F.Supp. 933 (S.D.N.Y.1980).

In *Won*, Judge Kashiwa was asked to decide whether these statutes authorized damages for injuries unrelated to any appeal of an administrative ruling. He expressed skepticism as to whether either the EAHCA or the Rehabilitation Act of 1973 permitted a damage claim, as opposed to a claim for injunctive relief (Memorandum Decision at 7–10). However, he expressly reserved ruling on both issues because in that case the claims were, he found, maintainable under 42 U.S.C. § 1983.

This Court need not step in where Judge Kashiwa left off and decide in this case whether damage actions are generally permissible under either or both acts. This case does not present that issue, as Katherine D. seeks only an order compelling compliance with the administrative order. Unlike the plaintiff in *Won*, she does not seek compensatory damages for the DOE's long-standing neglect of her rights under those laws.

Rather, Katherine D. seeks only to have this Court affirm the administrative decision insofar as it required the DOE to pay Defendant's $1,200 tuition for 1980–81. The DOE says this relief is barred by the Eleventh Amendment. It does not argue that this relief is not otherwise available under both acts. Given that the administrative hearing was commenced to obtain that sum, Katherine D. contends that an order requiring compliance is clearly part of the relief authorized by the EAHCA. If it were not, then this Court could give her no relief at all. Instead, she would be forced to go to state court and start a new action for her money.

This, surely, is not what Congress intended by its plan to vest this Court through the EAHCA with authority to give "*all* appropriate relief" in these cases. Sen.Conf.Rep. No. 94–455, 1975 U.S. Code Cong. & Admin. News 1425, 1480, 1503 (emphasis added).

The statute and the regulations implementing the EAHCA bear this out.

The statute provides that handicapped children are entitled to procedural safeguards with respect to whether the state is providing a "free appropriate public education." In the same vein, the regulations provide that:

> Disagreements between a parent and a public agency regarding the availability of a program appropriate for the child, and question of financial responsibility, are subject to the due process procedures [under the Act]. 45 C.F.R. § 121a.403(b).

These due process procedures include judicial review. Clearly then, by this language, the appropriate relief here would include an order compelling compliance with the administrative ruling requiring the DOE to pay Katherine D.'s tuition. If questions of financial responsibility are properly the subject of the hearing, and if the hearing decision can be appealed and all appropriate relief obtained, then, manifestly, orders can be entered to compel the state to accept financial responsibility.

Nor would it be consistent with the purposes underlying § 504 of the Rehabilitation Act of 1973 to force Katherine D. to go to state court to obtain her tuition reimbursement. Under 29 U.S.C. § 794a, the relief available under the Rehabilitation Act of 1973 includes all of the types permitted under Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*). This includes awards of back pay incidental to reinstatement orders. *McLaurin v. Columbia Muni. Separate Sch. Dist.*, 420 F.Supp. 949 (D.Miss.1976). An award of back pay is, obviously, closely analogous to an award of back tuition which, as here, would be ancillary to an order compelling compliance with an order requiring future compliance.

■ Moreover, insofar as the limited type of relief sought here is concerned, under both the EAHCA and the Rehabilitation Act of 1973, the state's claim of Eleventh Amendment immunity is without merit. When Congress acts pursuant to its powers under Section 5 of the Fourteenth Amendment, it can unquestionably supersede the immunity afforded by the Eleventh Amendment. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). A state may also waive its immunity under that provision even in the absence of congressional compulsion. *Parden v. Terminal Railway Co.*, 377 U.S. 184, 186, 84 S.Ct. 1207, 1209, 12 L.Ed.2d 233 (1964). The question whether the immunity has been (1) abrogated by Congress or (2) waived by the State depends upon an analysis of the State's actions and upon a close review of the legislative history of the two statutes. Katherine D. prevails on both arguments.

■ The state waived immunity in this case by coming voluntarily into this Court in the face of the congressional grant of authority to provide all appropriate relief and by its use of the appeal proceedings in this Court when, under 20 U.S.C. § 1415, the state courts also had jurisdiction.

The DOE should not be permitted to choose between two forums and then to contend that its choice forecloses the Defendant from obtaining relief which she would have been entitled to claim in the other court. When a state voluntarily appears in federal court as a suitor, it is deemed to have laid aside its immunity on all defensive matters properly brought before the Court relating to that claim and event. *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 459 F.Supp. 507 (D.Fla.1978), *aff'd.* 621 F.2d 1340 (5th Cir. 1980); *Burgess v. M/V Tamano*, 382 F.Supp. 351 (D.Mo.1974). The DOE is trying to avert compliance with the administrative ruling. By doing so, it has abandoned its immunity to any claim that will provide a defense to that claim or otherwise defeat the state's recovery. Absent some other justification, a claim for affirmative relief is not permitted. *Burgess, supra*, 382 F.Supp. at 356. Katherine D. does not seek money damages unrelated to enforcement of the hearing decision, she seeks only the beneficial consequences which would flow from an order affirming and prohibiting evasion of the administrative decision.

■ Even if there were no waiver, then this Court should nevertheless find it can enter an order directing compliance with the administrative ruling, including payment of the tuition for 1980–81 because Congress abrogated the DOE's immunity (at least to the limited extent of authorizing enforcement of administrative rulings) when it adopted the EAHCA and the Rehabilitation Act of 1973.

For purposes of the case at bar, *Fitzpatrick v. Bitzer, supra*, requires a close examination of the legislative history underlying the enactment of the EAHCA and the Rehabilitation Act in order to determine the intent of Congress. Insofar as section 504 is concerned, Congress specifically provided that, like section 601 of the Civil Rights Act of 1964 (the statute upon which Congress modeled section 504), section 504 would: "*permit a judicial remedy through a private action.*" 120 Cong.Rec. 20534 (1974), *reprinted* in 1974 *U.S. Code Cong. & Ad. News* 6373, 6391. In addition to authorizing enforcement by private citizens, Congress also recognized that section 504 would serve to effectuate the *equal opportunity* for disabled citizens to a wide range of governmental services and programs from which they had been previously excluded. On this point, Congress stated that:

> The section [504] therefore constitutes the establishment of a broad governmental policy that programs receiving federal financial assistance shall be operated without discrimination on the basis of handicap.
>
> .    .    .    .    .
>
> Section 504 was enacted to *prevent discrimination* against all handicapped individuals, regardless of their need for, or ability to benefit from, vocational rehabilitation services, in relation to Federal assistance in employment, housing, transportation, education, health services, or any other Federally-aided programs. Examples of handicapped individuals who may suffer discrimination in the receipt of Federally-assisted services but who may have been unintentionally excluded from the protection of section 504 by the

references to enhanced employability in section 7(g) are as follows: physically or mentally handicapped children who may be denied admission to Federally-supported school systems on the basis of their handicap; handicapped persons who may be denied admission to Federally-assisted nursing homes on the basis of their handicap; those persons whose handicap is so severe that employment is not feasible but who may be denied the benefits of a wide range of Federal programs; and those persons whose vocational rehabilitation is complete but who may nevertheless be discriminated against in certain Federally-assisted activities.

The legislative history of Pub.L. No. 94–142 and section 504 leave no doubt that these laws were enacted pursuant to Congress' power under the 5th section of the Fourteenth Amendment to enact "appropriate legislation" to enforce the substantive provisions of the Fourteenth Amendment (Senate Report 1 S.B. 6). Congress' frequent and specific references to the need to assure handicapped children an equal educational opportunity and to guarantee them adequate procedural safeguards is precisely the specific legislative intent to effectuate the equal protection rights guaranteed by the Fourteenth Amendment which *Fitzpatrick*, and later *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) recognized.

That the Congress fully recognized the potential liability of state educational agencies under the EAHCA is reflected in its efforts at "strength[ening]" and "clarify[ing]" the procedural protection of handicapped children so that a parent or guardian of a handicapped child could sue in federal court without regard to an amount in controversy to challenge any state educational decision. See *S.Con.Rep* No. 94–555, 1975, *U.S. Code Cong. & Ad. News* 1480, 1503. Since Congress undoubtedly knew that some handicapped children were placed in private schools and that there would be controversies about the states' reimbursement to parents for that schooling, Congress' enactment of the subject matter jur

isdiction section of Pub.L. No. 94–142 shows that it rejected the notion that local or state agencies could hide behind the Eleventh Amendment.

To restrict the federal court's power to enforce § 504 and Pub.L. 94–142 by limiting its reach in cases involving state-run federally assisted programs would plainly hamper the enforcement of those laws and their viability as effective tools against discrimination.

In *Won, supra,* Judge Kashiwa observed that, at a minimum, the EAHCA authorizes this Court to "frame an appropriate educational program" (*Id.* at 10). Here, that framework is supplied by the administrative order.

Finally, Judge Kashiwa observed that in *Won* there was no claim that the state had waived its immunity. Here, in contrast, there is evidence of waiver and the relief sought is only that necessary to effectuate the administrative decision. If Congress intended this Court to do anything in these cases, it was to fully enforce correct administrative rulings.

The only Court to consider this question has unqualifiedly approved this analysis. In *Monahan v. State of Nebraska,* 491 F.Supp. 1074 (D.Neb.1980), *aff'd.* 645 F.2d 592, 3 E.H.L.R. 552:380 (8th Cir. 1981) the court distinguished between damages for emotional injury and future wage loss, on one hand, and awards of tuition for school expenses incurred between the start of the administrative proceedings and final resolution of the litigation, on the other. The former was viewed skeptically. The latter, however, was specifically approved as being appropriate and allowable in actions under the EAHCA. 491 F.Supp. at 1094.

In substantial part, the court held that this limited damage remedy was warranted because Congress had foreclosed the court from giving any interim equitable relief which would change the status quo as it existed prior to commencement of the administrative proceedings. 491 F.Supp. at 1088–94. Given that the absence of equitable relief would, in some instances (e.g., *Monahan* and here), leave the burden of financing a private school placement on the parents *pendente lite,* even though such a placement was in fact the state's responsibility, clearly an award of tuition is an essential part of the appropriate relief. (*Id.*)

Section 1983 provides a cause of action against state officials who violate federal statutory rights, including those arising under the Rehabilitation Act and the EAHCA. See *Won, supra,* at 10–11. Persons who successfully make claims under § 1983 are entitled to be awarded attorney's fees and costs under 42 U.S.C. § 1988. This includes fees for work done at the administrative level (Cf. *New York Gaslight Club v. Carey,* 447 U.S. 54, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980) [Claimant in Title VII administrative proceeding can recover for fees spent in that proceeding and can bring suit solely to recover such fees. The operative language of § 1988 is identical to that of Title VII and Congress' stated goals are virtually identical] ) as well as that done in connection with litigation.

These fees, although nominally awardable only against individual state officials are collectible from the state treasury. See *Finney v. Hutto,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). The EAHCA contains no separate fee provision; in such cases, the fees are awardable under § 1988 (See, e.g., *Lee v. Clark,* Civ. No. 80–0418, Memorandum Opinion (D.Haw. April 30, 1980).

Likewise, persons who successfully pursue claims under § 504 are entitled to recover their fees and costs for administrative (See *Watson v. Veterans Administration,* 88 F.R.D. 267 (C.D.Cal.1980)), as well as judicial proceedings. The Rehabilitation Act, however, has its own specific fee provision. 29 U.S.C. § 794a(b). The fees awardable under § 504 can be assessed without regard to the Eleventh Amendment immunity against the state itself. By its terms, 29 U.S.C. § 794a(a)(2) applies to "any action or proceeding" under § 504. Given that Congress surely knew that the states were among the potential defendants, and given

the Fourteenth Amendment foundation of § 504, here, as in the case of § 1988, Congress must have intended to impose fees awards upon state defendants.

■ The fees awardable under § 1988—once a suable nominal defendant is joined—may also be granted without regard to such immunity. The Supreme Court expressly so held in *Hutto, supra.*

■ Under both statutes, fees should be awarded as a matter of course and should be denied only if there are special circumstances that would make such an award unjust. Here, there are no such circumstances and Defendants are entitled to attorney's fees and costs.

By reason of the foregoing:

(1) The administrative hearing officer's decision is hereby affirmed;

(2) The Defendants are hereby awarded reimbursements for tuition paid for Katherine D. at St. Philomena's School; and

(3) The Defendants are hereby awarded attorney's fees in the sum of $15,000, together with their costs as taxed.